Daniel J. DE LA FUENTE, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–06–00838–CR.

Court of Appeals of Texas, San Antonio.

May 21, 2008.

Discretionary Review Refused Oct. 1, 2008.

---

Richard E. Langlois, Law Offices Of Richard E. Langlois, San Antonio, TX, for Appellant.

Scott Roberts, Assistant Criminal District Attorney, San Antonio, TX, for Appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, PHYLIS J. SPEEDLIN, Justice, STEVEN C. HILBIG, Justice.

## MEMORANDUM OPINION

Opinion by PHYLIS J. SPEEDLIN, Justice.

Daniel De la Fuente appeals his conviction for engaging in organized criminal activity and theft in the aggregate value of $200,000 or more. De la Fuente chiefly complains that: 1) the trial court erred in allowing him to represent himself at trial; 2) he was subjected to multiple punishments for the same offense when he was convicted and sentenced for both engaging in organized criminal activity with theft as the underlying offense, and theft; and 3) the evidence is legally and factually insufficient to support his conviction. We overrule these issues and affirm the judgment of the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

De la Fuente was indicted for the felony offenses of engaging in organized criminal activity with theft as the underlying offense (Count I) and theft in the aggregate value of $200,000 or more (Count II). Twenty-five complainants testified at trial, detailing how De la Fuente, who used numerous aliases and business names, promised to remodel their homes, but failed to either begin or complete the work after he accepted down payments ranging from $1,000 to $15,000. The jury found De la Fuente guilty on both counts. He was assessed punishment at 90 years' confinement on each count, to run concurrently, and a $10,000 fine. De la Fuente timely appealed.

### Trial Proceedings Prior to the Presentation of Evidence

On the first day of trial, De la Fuente requested to proceed pro se because he was "the only one that knows this case" and because he did not have the "financial money" to pay his attorney, Armando Martinez, for the amount of time he felt was required to prepare for the intricacies of a trial involving over twenty complainants. Because the case was now on its sixth setting, De la Fuente stated that he would rather represent himself than trust his defense to an attorney who did not have time to sufficiently acquaint himself with the facts of his case. The trial court cautioned De la Fuente about waiving his right to counsel, and elicited that De la Fuente was 45 years old, had a seventh grade education, extensive experience in carpentry, no military experience, and no legal or trial experience, aside from studying "the law of God." The State expressed its belief that De la Fuente was choosing to represent himself because he could not find an attorney who agreed with him as to how to best prepare his defense. Martinez reiterated that there was "a difference of opinion" between him and De la Fuente as to how the case ought to be handled and Martinez stressed that "it's in the best interest if somebody separate from me is in this case." The trial court, concerned that De la Fuente was waiving the right to counsel due to financial reasons, denied his request to proceed pro se and instead appointed De la Fuente's retained counsel, Martinez. The trial court told Martinez that "anytime that you believe that there is a fundamental difference of opinion between what your client wants you to do and what you're advising him to do, you may ask me to take a break and you may certainly get those matters on the record . . . ." Martinez conducted voir dire that afternoon.

The next day, Martinez filed a motion to withdraw and substitute counsel requesting that Raymundo Aleman be substituted as the attorney of record for De la Fuente; however, Martinez told the trial court that

De la Fuente actually desired to represent himself. The trial court advised De la Fuente that he could not have Aleman represent him while also representing himself, but that Aleman could serve as standby counsel and "advise [him] of any procedures that need to be followed." The court confirmed that De la Fuente did not have a history of mental disorders or psychiatric treatment, and explained the charges against him and the potential range of punishment. De la Fuente was also cautioned that he would be "expected to comply with all the rules of procedure, and ... to be knowledgeable as to the substantive law that applies to this case." When asked whether he had any questions regarding the matter, De la Fuente answered that the trial court had been "crystal clear." Subsequently, the court granted the motion, adding, "[a]nd further, that Defendant, desiring to represent himself, will be allowed to do so, Mr. Aleman being utilized as stand-by counsel."

### Trial Proceedings—Testimony

Twenty-five complainants testified against De la Fuente at trial. Juan Castillo hired "Centex Remodeling" to remodel his kitchen after reading their full-page advertisement in the phonebook. The ad stated that the company was licensed and bonded, offered a lifetime transferable warranty, and had twenty years of experience serving San Antonio. An estimator named "Mike" came to the Castillo home to discuss the project wearing a Centex baseball cap. Mike told Castillo he was part of the remodeling division of Centex Homes—a local, reputable homebuilder—and that they were "sister" companies. Castillo paid an $8,000 deposit to Centex at the end of February 2005; the work was scheduled to commence on March 21, 2005. The project did not begin on time, and Mike did not return Castillo's calls. The office secretary, Frank, repeatedly gave excuses for why the project could not start, and Castillo was told to contact Centex's owner, Bernard Beckingham. Finally, in May, one worker came to the Castillo house and began demolition work in the kitchen. However, the project was never finished and Castillo's home was left in disrepair. Castillo later identified Daniel De la Fuente in a police photo lineup as Mike.

Alice Moseley hired "Pulte Building" for a home remodeling project after seeing their ad in the phonebook. In the ad, the address listed for Pulte Building is 14726 Bulverde Road. A man by the name of "Frank Martinez" came to Moseley's home to discuss the project; Frank told Moseley that Pulte was the remodeling arm of Pulte Homes. Moseley hired Pulte because she was familiar with the larger, reputable company named Pulte Homes. Moseley paid $5,967 as a down payment after signing a remodeling contract also signed by Apolonio Hernandez on behalf of Pulte Building, but the project never started. After discovering that Pulte did not have an office at 14726 Bulverde Road, Moseley canceled her contract. Apolonio Hernandez sent a letter offering to refund fifty percent of Moseley's down payment, but she did not respond, insisting she was entitled to a full refund. No money was ever returned to Moseley. Moseley later identified Daniel De la Fuente as Frank Martinez in a photo lineup.

Ada Minge hired "Ace Remodeling" to repair her bathroom after reading its phonebook ad. Daniel De la Fuente discussed the project with Minge and requested a $2,896 down payment on July 1, 2003. At the end of August 2003, a worker named Joe dismantled the shower. De la Fuente then stated that mold was discovered in the bathroom, and required Minge to sign a mold remediation contract before he would complete the bathroom project.

Minge paid an additional $1,100, but never saw any mold in the bathroom. The project was never completed and Minge hired another company to complete the project.

Marilyn Weininger hired "Centex Remodeling" for a garage conversion project. A man named "Robert" came to her home to discuss the project. She wrote two checks to Centex for $4,560 each. The only work that was performed was some minor electrical wiring in the ceiling. Weininger called Robert to cancel the project after it became apparent to her that it would not be completed in a timely manner. Robert promised to return the entire amount paid, but Weininger only received a check for $4,500 signed by Bernard Beckingham, whom she was told was the owner of Centex. Weininger later identified De la Fuente as the man she knew as Robert in a police photo lineup.

Rosalyn Cunningham hired "Centex Remodeling" to add a room to her home after seeing its phonebook ad. Mike Gonzalez, whom Cunningham later identified as De la Fuente, discussed the project with Cunningham and took her to a home that he had remodeled; Cunningham later learned the home belonged to De la Fuente. The estimate for the Cunningham project was $64,671, but Mike agreed to complete the work for $30,000 with the additional amount to be "charged off" by Bernard Beckingham, the owner of Centex. Cunningham took out a home equity loan to finance the remodeling project and made two payments of $15,000 and $14,102. Cunningham gave the checks to Mike, who told her not to fill out the payee line because he had a stamp in his car. After the checks cleared the bank, Cunningham noticed that the name "Apolonio Hernandez" had been written on the payee line. After two months passed and no work had begun, Cunningham tried to locate a physical office for Centex, but discovered the

address listed in the phonebook was a post office. She then demanded a full refund and was given a check for $29,102 signed by Bernard Beckingham, but was told to hold it for a month. When she attempted to cash the check it was dishonored. Mike and Apolonio then came to her home to present a cancellation proposal offering to return 80% of her money; she eventually received $12,000 back.

Ruth Jones McClendon testified that she hired "Centex Remodeling," which she selected based on its phonebook ad, to perform a remodeling project at her house. "Robert," whom McClendon later identified as De la Fuente, told McClendon that Centex was a sister company of Centex Homes. Robert gave McClendon a list of references, but never told her that the majority of the persons listed were his relatives. On September 22, 2004, McClendon gave Robert a $10,000 check as a down payment on the remodeling project. The work did not begin as promised, and after several telephone calls to Robert, McClendon was told that a large tree in her backyard would have to be removed before work could begin. A man came to her home and spent about a month trying to dig the tree out with a hand-held pick. Before McClendon gave Robert any more money, she insisted on seeing some of his past remodeling projects. He took her to a house in a gated community and let himself in with a key left under the door mat. After seeing the home, McClendon gave Robert another check for $10,000 at the end of October. McClendon later learned the home actually belonged to De la Fuente. After that, one man began working in McClendon's backyard by digging dirt out of a hole and dumping it in the park behind her house with a wheelbarrow; the man quit coming to her house in November and no further work was performed. McClendon then complained to Robert, who told her he would relay her

concerns to the owner of the company, Bernard Beckingham; Beckingham could never be reached by McClendon. McClendon stated that she wrote one of the $10,000 checks out to Apolonio Hernandez, who was supposed to be doing the foundation work.

Karen Kramer contacted "Ace Remodeling and Decorating" after seeing its phonebook ad. Daniel De la Fuente, who represented himself as Ace's estimator, prepared a proposal for the home addition, and requested a down payment of $8,750. De la Fuente promised to begin the work the following Monday, but never showed up. Kramer called De la Fuente, who told her that the architect had not yet drawn up the plans. After another week passed, Kramer asked for a full refund, but was told that she would have to contact the owner of the company, Apolonio Hernandez. After another two weeks, Kramer was finally told she could not have a refund, but the work would begin on her home the following Monday. De la Fuente arrived on Monday with a man he called "Edward Reyna;" however, the work did not begin because De la Fuente stated he did not have a permit. The next day, Kramer decided she did not want him to begin the project and again asked for a full refund. Kramer later identified Apolonio Hernandez from a photo lineup as the person she was introduced to as Edward Reyna. Reyna drove away in a truck that Kramer found out was registered to Rudy De la Fuente, the brother of Daniel De la Fuente. Kramer was refunded all but $250.

Feliciano Perez wanted to remodel his elderly father's garage after it was damaged by fire. Perez hired "Centex Remodeling" to perform the work based on its phonebook ad which highlighted Centex's twenty years of experience. Perez stressed to De la Fuente that because his father's mental capabilities were diminished, he had to be present at the contract signing and payment of money. Despite this, De la Fuente came to the Perez home when he knew Perez would be at a basketball game and had Perez's father sign a check for $2,850. Perez stated that when he called Centex from his parents' home no one answered, but when he called from a different location, the phone was answered. Perez also paid $800 to Apolonio Hernandez and $1,000 to De la Fuente. Perez stated that De la Fuente did not complete the work as described in the remodeling contract.

Raymond Flores hired "Ace Remodeling" to perform kitchen and bathroom work after seeing their full-page phonebook ad. De la Fuente told Flores about his past work experience and gave him a list of client referrals. The referral sheet listed Apolonio Hernandez as the owner of Ace Remodeling. Flores wrote two checks to De la Fuente in the amounts of $1,000 and $12,562. De la Fuente told Flores that if he paid in full up front, he could get discounts on the materials and the project would also be expedited. The work was scheduled to begin two weeks after the contract was signed on June 17, 2003, but two workers named Joe and Rudy did not arrive until the end of July or the beginning of August. Joe and Rudy gutted the kitchen and two bathrooms, but told Flores the new tubs and sinks were not ready to be installed. After Flores threatened to call a local news station to complain, De la Fuente told Flores that mold had been discovered in the home and that the project could not proceed until the mold was remediated; Flores signed a mold remediation contract and paid an additional $5,500 on September 12, 2003. De la Fuente then sealed off the bathrooms and kitchen counters with plastic and duct tape, and sent samples to a lab to be tested for mold. No further work was

performed on the house until November, and it was of inferior quality; Flores, tired of the delays, finally called De la Fuente to cancel the contract.

Louise Stuteville hired "Centex Remodeling" to replace her carport with a garage. Robert Gonzalez, whom Stuteville later identified as De la Fuente, came to her home to discuss the proposal. She paid $7,295, half of the total contract price, in mid-December 2003. The project was supposed to take four weeks. Concrete was poured at the beginning of February and the garage was demolished at the beginning of March. The garage doors were not installed until April, and the work was unsatisfactorily performed. The gate, gutters, electrical outlets and garage door opener were not installed as called for in the contract. Stuteville also paid an additional $2,350 to have a fence installed, which was never done.

Emma Chamberlain contracted with "Centex Remodeling" to remodel her home in June 2004. Robert Gonzalez, whom she later identified as De la Fuente, stressed that because Centex had twenty years' experience, they could handle the project. Chamberlain paid $14,960 to begin the project, and Joe, later identified as Apolonio Hernandez, began demolition work. Chamberlain later made two additional payments of $14,960 each. Workers stopped coming to her house months later. Chamberlain attempted to contact Bernard Beckingham, who was listed as the company owner on Centex's website, but to no avail.

Christine Pelletier hired "Centex Remodeling" to perform remodeling work on her home based on their full-page phonebook advertisement. Robert Gonzalez, whom she identified as De la Fuente, came to Pelletier's home two to three times before she signed the proposal; he always answered his cellular phone when she called him prior to the signing of the contract. At the end of June 2004, Pelletier paid $3,567 and demolition work began. She then paid an additional $3,567 to purchase supplies, but very little work was done after that. In late September, Pelletier became worried because the entire project was only supposed to take four weeks, and Robert had become increasingly difficult to reach. At the end of September, Robert told Pelletier that he would not complete the job unless she made the last payment of $3,567; Pelletier refused. She attempted to send Bernard Beckingham, the company's owner, a certified letter to the address listed in the phonebook ad, but it was returned "address unknown." Centex did not perform any more work, and the work it had performed had to be redone because it was unsafe and unusable. Pelletier identified Apolonio Hernandez in a photo lineup as a man who had done work at her home.

Israel Ramirez paid Robert Gonzalez of "Centex Remodeling" $7,650 to perform foundation work and a bathroom remodeling project. The work started late, and one to two workers would come to Ramirez's house for only one to two hours at a time every few days. Ramirez was never able to get in touch with Robert, later identified as De la Fuente, after the payment was made. The work on Ramirez's house was left unfinished.

Jim Whitehead testified that Daniel De la Fuente of "Ace Remodeling" came to his home to discuss a remodeling project after he saw their ad in the phonebook. Whitehead made a down payment of $3,790 at the beginning of June 2003, and paid $5,000 at the end of the same month. Two workers, including De la Fuente's brother, Rudy, came to the house for four days to perform demolition work. After that, between July 3 and September 3, a total of four hours of work was performed on

Whitehead's house. The house was uninhabitable because the walls had been ripped out. Whitehead eventually went to the address listed for Ace Remodeling—23612 Northwood Lane—which was a private residence in a gated community, and saw De la Fuente's car parked in the driveway; no one answered the door. Whitehead waited outside until a young man who identified himself as De la Fuente's nephew told Whitehead the company had moved to 3819 Clark. When Whitehead went to that address, he found a post office.

Norma McGee chose "Ace Remodeling" to perform remodeling work in her home because their phonebook ad stated they were licensed, bonded, and had twenty-five years' experience. A sales representative named Daniel De la Fuente came to her home to discuss the project and claimed it could be done in two weeks. McGee paid $8,507 when the proposal was signed on June 3, 2003, and paid $4,250 shortly thereafter. De la Fuente told McGee that Apolonio Hernandez was the owner of the company; in a police photo lineup, McGee identified Rudy De la Fuente as the man she had been introduced to as Apolonio Hernandez. A minimal amount of work was performed on the house, but McGee could not get De la Fuente to return her calls and the work was not completed.

Judy Yeary hired "Ace Remodeling" to remodel her two bathrooms in April 2003. Yeary paid $3,500 to begin the project, which was supposed to be completed in two weeks. After the first bathroom was demolished, De la Fuente told her that mold had been discovered, and he needed an additional $200. When Yeary refused to pay, De la Fuente told her that if she paid the contract balance of $1,000, he would not need the additional $200; Yeary paid $1,000. The second bathroom was demolished and mold was also discovered.

Eventually, workers stopped coming to the house despite Yeary's repeated phone calls to De la Fuente. Yeary identified Rudy De la Fuente and Apolonio Hernandez in a police photo lineup as "Rudy" and "Joe," both of whom worked on her home. Yeary was told that Hernandez was the owner of the company. Yeary located an assumed name certificate and discovered that "Ace Remodeling" was registered to Joshua De la Fuente, De la Fuente's son.

Betty Peters contracted with Daniel De la Fuente of "Ace Remodeling" to remodel her home. The total proposal price was $13,400, and De la Fuente requested an advance payment of $6,700 on July 9, 2003. A month passed with little work being done, and Peters then contacted the Better Business Bureau and the attorney general's office; Peters received $4,500 back from De la Fuente.

In May 2003, Kenneth Hillje hired "Ace Remodeling" to convert his garage into a studio apartment for his mother. Hillje saw Ace's ad in the phonebook, and noted they were insured, licensed and bonded, and had been in business for over twenty-five years. De la Fuente gave Hillje a business card with the name Broadway Remodeling on it; he told Hillje that Ace was taking over Broadway and that it was just an old business card. De la Fuente also told Hillje that Apolonio Hernandez was the owner of Ace. There was only one worker at Hillje's home at a time, and the work progressed slowly; after three weeks, all work ceased. In a photo lineup, Hillje identified Rudy De la Fuente as "Rudy Hernandez" and Apolonio Hernandez as "Joe," both of whom performed work on Hillje's house. Hillje paid half of the contract price, $5,250, in advance. Hillje did not believe that De la Fuente performed $5,000 worth of work.

After receiving five different bids, Jessica Leslie hired "Ace Remodeling" to re-

model her two bathrooms. Leslie discovered Ace after seeing their phonebook ad. She signed a proposal with Daniel De la Fuente in March of 2003, and was told the project would take two weeks to complete. The project began in April, and De la Fuente introduced Rudy as the foreman; at that time Leslie paid De la Fuente $3,000. Demolition work began and the following week, De la Fuente asked for another $3,000. When Leslie refused, De la Fuente told her that he could not work for her unless trust was involved, so she relented and wrote him another check for $3,000. Leslie never saw De la Fuente again after that.

In February 2003, Evelyn Edwards hired "Ace Remodeling" to perform work on her home; she chose the company through its phonebook ad and relied on the fact that it was licensed, bonded, and insured. An estimator, Daniel De la Fuente, came to Edwards's home to discuss the project. Edwards paid De la Fuente $7,714; ten days later, he came to the house and spent five minutes using spray paint to mark where the garage addition was planned. Edwards identified Apolonio Hernandez as the associate De la Fuente brought with him to her home. When no one returned to do any work, Edwards investigated and learned that Ace was not a licensed company. She then sought to cancel the remodeling contract; De la Fuente eventually returned $3,007 to Edwards.

Rachel Aragon hired "Ace Remodeling" to replace some walls and windows due to mold. She chose Ace because, according to the phonebook ad, it had been in business for over twenty-five years. In mid-March 2003, Aragon paid Daniel De la Fuente $1,925. After that, some demolition work and spraying for mold was performed; Aragon identified Apolonio Hernandez as the man who worked on her home. All work then ceased; Aragon tried to reach De la Fuente, but a female answered the phone and her calls were not returned.

Billie Arredondo hired "Broadway Remodeling" in October 2002 to replace some windows and repair the foundation at her home. Arredondo's husband wrote De la Fuente a check for $9,000 in October. Arredondo paid another $6,925 on November 6, 2002; a week later, De la Fuente told Arredondo, who suffers from short-term memory loss, that he had not been paid by her husband, and she then wrote a check for $5,700. Construction began but not all of the work was completed. In a photo lineup, Arredondo identified Apolonio Hernandez as a man she recognized who worked at her home.

Mary Gwaltney hired Daniel Fuente, later identified as Daniel De la Fuente, of "Ace Remodeling" to perform a remodeling project on her house. In a photo lineup, she identified Apolonio Hernandez as "Joe," one of the men who worked on her home. Gwaltney signed a remodeling proposal in January 2003 and paid $6,966, a third of the total cost. Work was expected to commence in February; the project would take three weeks to complete. Preparation work, including moving furniture, was performed. In mid-February, Gwaltney paid another $6,966. In mid-March, before Gwaltney left for vacation, she paid another $6,966 based on De la Fuente's promise that the work would be completed while she was out of town. The work was not completed, and the kitchen and bathroom were left gutted; appliances were left on her patio and in the yard. Gwaltney attempted to contact De la Fuente and Apolonio Hernandez, the company's purported owner, but to no avail.

Holly Blair hired Robert Gonzalez, whom she later identified as De la Fuente, of "Centex Remodeling" to build a garage

apartment for her aging mother. She relied on the ad's representation that Centex was bonded and had twenty years of service. At the end of December 2003, Blair paid De la Fuente $12,728.50 to begin the project right after Christmas. By the end of March, however, the only work that had been completed was the digging of trenches, installation of some plumbing, and the pouring of foundation; Blair stated that the quality of the work performed was poor and she had to pay over $2,000 to repair the foundation, and the plumbing had to be removed and reinstalled. A worker named Joe Hernandez did the work on Blair's house; Blair identified Apolonio Hernandez in a photo lineup as the man she recognized as Joe Hernandez. A man named Rudy, who Blair stated looked liked De la Fuente, did the foundation work. At the end of March, De la Fuente asked Blair for an additional $10,000; she refused because very little work had been completed at that time. She called the phone number on the contract, but it was not functioning. At the beginning of April, Bernard Beckingham sent Blair a letter stating that Centex was willing to complete the job if she paid the balance of $12,728.50. Blair then received a letter signed by Apolonio Hernandez stating that the "[t]ime schedule has been canceled by Apolonio Hernandez D.B.A. Hernandez Remodeling Due to home owner not wanting to pay Centex for the balance on proposal." The contractors who Blair hired to finish the project estimated that the value of Centex's work was less than $5,000.

In February 2002, Tina Medrano hired "Broadway Remodeling" to remodel her house. She paid De la Fuente $15,000, the full contract price, to begin the project, which included leveling the house, re-doing the roof, and renovating a room. Medrano hired Broadway because De la Fuente told her he had state-of-the-art equipment to level the house; only one worker, Joe, performed the majority of the leveling using a jackhammer. Cedar beams were not used in the renovation, as called for in the contract. Medrano attempted to get her money back from De la Fuente, but he only returned $3,000; the work was never finished.

Also at trial, James Sides, a sergeant with the San Antonio Police Department's special crimes unit, testified that a search of De la Fuente's home at 23612 Northwood Lane in August 2005 uncovered the following items: three magnetic placards for use on the side of an automobile bearing the names "Capital Remodeling," "Centex Remodeling," and "Pulte Building;" boxes of business cards for Capital, Centex and Pulte, as well as business records for the three companies; mail addressed to Bernard Beckingham; correspondence from attorneys or clients regarding Beckingham; blank checks signed by Apolonio Hernandez; several cell phones, cash, and credit cards. In the cabana house, where De la Fuente's son, Joshua, appeared to be living, authorities found over $25,000 in cash and a Texas driver's license for Joshua Aaron De la Fuente with a false date of birth of March 18, 1974. The total cash found in the residence, cabana house, and cars was $30,472.09.

Patricia Strader, an investigator with the district attorney's office, testified that in 2005 she investigated a complaint regarding a construction job. She determined that Joshua De la Fuente, Rudy De la Fuente, Apolonio Hernandez, and Bernard Beckingham worked with Daniel De la Fuente to start home remodeling jobs which they did not complete after taking money from the homeowners. Strader never found a warehouse or building that would house large equipment or tools used in home remodeling projects. She located

several assumed name certificates reflecting the various business names and addresses used by De la Fuente, including "Broadway Remodeling," registered to Rudy De la Fuente; "Centex Building and Remodeling," registered to Bernard Beckingham; "Pulte Builders," registered to Apolonio Hernandez; and "CenTex Builders and Renovation," registered to Apolonio Hernandez. She also found a Notice of Abandonment of Assumed Name, reflecting Joshua De la Fuente's intent to abandon his interest in "Ace Remodeling" on April 7, 2003, the same day that "Ace Remodeling" was registered to Apolonio Hernandez.

Strader also discovered that the home on Northwood Lane was purchased for $297,000 by Joshua De la Fuente on August 24, 2001; Joshua was seventeen years old at the time. The mortgage loan application, however, lists a false date of birth and states that Joshua had been employed by Lone Star Remodeling and Decorating as an architect engineer for the past four years. It notes that a "Daniel Hernandez," Lone Star's office manager, verified Joshua's employment information. Finally, Strader stated that Beckingham and Hernandez shared in the profits received from the remodeling projects, but they lived very poorly in comparison to Daniel De la Fuente.

### ANALYSIS

*Self Representation*

 In his first issue, De la Fuente contends the trial court erred in permitting him to represent himself at trial because he did not competently, intelligently, and voluntarily waive his right to counsel. An accused may waive his constitutional right to assistance of counsel provided that the decision is made (1) competently, (2) knowingly and intelligently, and (3) voluntarily. *Faretta v. California*, 422 U.S. 806,

834–35, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Collier v. State*, 959 S.W.2d 621, 625 (Tex.Crim.App.1997). A knowing and intelligent waiver requires that the defendant have a full understanding of the extent of the benefit he is abandoning, as well as the dangers and disadvantages of self-representation. *Collier*, 959 S.W.2d at 626. Additionally, the decision to waive counsel is voluntarily made if it is uncoerced. *Id.* If, after proper admonishment, the record reflects that the defendant "knows what he is doing and his choice is made with eyes open," the defendant's decision to proceed pro se will not be disturbed. *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525.

De la Fuente argues that he did not competently waive the right to counsel because he was not aware of the grave duty with which he was charging himself and he failed to appreciate the dangers of self-representation, even though the trial court properly admonished him. He avers that he did not knowingly and intelligently elect to proceed without counsel given his "background, lack of education[,] and misguided sense of spiritual preparedness." Finally, De la Fuente contends that his waiver of counsel was involuntary because he was "impliedly coerced into waiving his right to counsel because [his attorney] used his authority and position to strong arm [De la Fuente] into asserting his right to self-representation." The record does not support these contentions.

The record reflects that the trial court fully admonished De la Fuente regarding the dangers and disadvantages of self-representation before granting his request to proceed pro se. The trial court questioned De la Fuente at length regarding his age, education level, vocation, military experience, mental health history, and any medical problems that might prevent him from adequately representing himself. He was

also cautioned that he would be held to the same standards as an attorney. The record demonstrates that De la Fuente was adamant and consistent in his desire to represent himself, and that he acknowledged his understanding of the dangers and disadvantages of representing himself. Nothing in the record indicates that De la Fuente's decision was less than knowing, intelligent, and voluntary. Because De la Fuente validly invoked his *Faretta* right to self-representation, we hold the trial court did not err in allowing De la Fuente to represent himself.

### Motion to Withdraw and Appointment of Stand–By Counsel

In a related issue, De la Fuente contends the trial court abused its discretion in allowing his appointed counsel, Martinez, to withdraw, and in appointing stand-by counsel who was not fully apprized of the facts of his case. *See King v. State,* 29 S.W.3d 556, 566 (Tex.Crim.App. 2000) (noting trial court has discretion to determine whether counsel should be permitted to withdraw from a case). De la Fuente asserts that Martinez's mere "difference of opinion" with him as to how to handle the case failed to justify his withdrawal, and that his conduct amounted to an "abandonment" of the case. The record reflects, however, that De la Fuente did not object to Martinez's withdrawal, but instead repeated his desire to represent himself. As discussed, *supra,* De la Fuente expressed his understanding of the disadvantages and dangers involved in waiving his right to counsel, and persisted in his desire to represent himself. Accordingly, based on this record, we cannot conclude the trial court abused its discretion in granting the motion to withdraw, and in appointing stand-by counsel to assist De la Fuente in his self-representation. *See id.* (trial court has no duty to search for counsel agreeable to the defendant); *see also Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct.

2525 (court may appoint stand-by counsel over defendant's objection); *Medley v. State,* 47 S.W.3d 17, 23 (Tex.App.-Amarillo 2000, pet. ref'd) (stand-by counsel does not equate to Sixth Amendment counsel).

### Double Jeopardy

De la Fuente next argues that the offenses of theft and engaging in organized criminal activity through theft constitute the same offense for double jeopardy purposes; therefore, his constitutional rights were violated when he received multiple punishments for the same offense. *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 14; *Saenz v. State,* 166 S.W.3d 270, 272 (Tex.Crim.App.2005) (double jeopardy clause prohibits multiple punishments for the same offense). A person commits the offense of engaging in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination ... he commits or conspires to commit ... theft...." TEX. PENAL CODE ANN. § 71.02(a)(1) (Vernon Supp.2007). De la Fuente contends that theft and engaging in organized criminal activity through theft are the same offense for double jeopardy purposes because theft is a lesser included offense of the greater offense, engaging in organized criminal activity through theft. *See Whalen v. United States,* 445 U.S. 684, 693–94, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Generally, under the *Blockburger* test, greater inclusive and lesser included offenses are the "same offenses" for double jeopardy purposes. *Parrish v. State,* 869 S.W.2d 352, 354 (Tex.Crim.App.1994); *Quintanilla v. State,* 40 S.W.3d 576, 579 (Tex.App.-San Antonio 2001, pet. ref'd). However, in the context of multiple punishments, the *Blockburger* test does not trump "clearly expressed legislative in-

tent." *Garza v. State*, 213 S.W.3d 338, 351–52 (Tex.Crim.App.2007). In this case, the legislature has specifically authorized conviction and punishment for both engaging in organized criminal activity and any of the underlying offenses listed in section 71.02. TEX. PENAL CODE ANN. § 71.03(3) (Vernon 2003) (it is not a defense to prosecution under section 71.02 that "a person has been charged with, acquitted, or convicted of any offense listed in Subsection (a) of Section 71.02"); *Garza*, 213 S.W.3d at 352 (construing section 71.03(3) as clear legislative expression of intent that defendants charged with both organized criminal activity and commission of underlying offense may be punished for both, at least in the same proceeding, "notwithstanding their 'sameness'"). Accordingly, we hold that De la Fuente did not receive multiple punishments for the same offense in violation of the double jeopardy clause. His third issue is overruled.

### Sufficiency

 Finally, De la Fuente challenges the legal and factual sufficiency of the evidence to support his convictions for theft and engaging in organized criminal activity. When the legal sufficiency of the evidence to sustain a criminal conviction is challenged, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex.Crim.App.2005). Considering the entire record, and viewing all the evidence in the light most favorable to the verdict, we assume the trier of fact resolved all conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Rollerson v. State*, 227 S.W.3d 718, 724 (Tex.Crim.App.2007).

 In evaluating factual sufficiency, we review all the evidence in a neutral light, and set aside the jury's verdict only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or (2) the verdict is against the great weight and preponderance of the evidence. *Cain v. State*, 958 S.W.2d 404, 408 (Tex.Crim.App.1997); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App. 2000). We must remain mindful that the jury is the sole judge of the credibility of the witnesses, and may choose to believe all, some, or none of a witness's testimony. *Cain*, 958 S.W.2d at 407 n. 5. Under the first prong, we may not conclude the verdict is "clearly wrong" or "manifestly unjust" simply because, based on the quantum of evidence admitted, we would have rendered a different verdict. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). Similarly, under the second prong, we may not conclude that a conflict in the evidence requires a new trial simply because we disagree with the jury's resolution of the conflict—the great weight and preponderance of the evidence must contradict the jury's verdict before we may reverse on that basis. *Id.*

### Criminal Intent

As a preliminary matter, De la Fuente contends that because all of the complainants voluntarily paid him, he did not act with the requisite criminal intent to commit theft, and therefore this case amounts to nothing more than a civil contract dispute. A person commits theft "if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE ANN. § 31.03(a) (Vernon Supp. 2007). Appropriation of property is unlawful if it is without the owner's effective consent. TEX. PENAL CODE ANN. § 31.03(b)(1) (Vernon Supp.2007); *Stewart v. State*, 44 S.W.3d 582, 589 (Tex.Crim. App.2001) (the "crucial element of theft is the deprivation of property from the right-

ful owner, without the owner's consent …"). "Consent" is not effective if it is induced by deception. Tex. Penal Code Ann. § 31.01(3)(A) (Vernon Supp.2007). Here, deception means "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true," or "promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed…." Tex. Penal Code Ann. § 31.01(1)(A), (E) (Vernon Supp.2007).

■ Claims of theft arising out of contract disputes require a form of deception to rise to the level of criminal conduct. "A claim based upon malfeasance in connection with a contract requires proof of the false pretext or fraud in order to become a viable criminal prosecution." *Baker v. State*, 986 S.W.2d 271, 274 (Tex.App.-Texarkana 1998, pet. ref'd). "If no more than intent and appropriation is shown in a contract claim, nothing illegal is apparent, because under the terms of the contracts individuals typically have the right to 'deprive the owner of property,' albeit in return for consideration." *Id.* (internal citations omitted). The mere fact that a person failed to return money after failing to perform a contract does not, by itself, constitute theft. *Id.* (citing *Hesbrook v. State*, 149 Tex.Crim. 310, 194 S.W.2d 260, 262 (1946)). Criminal intent may be inferred from the defendant's conduct and the surrounding circumstances. *Id.; Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004). Therefore, in order to convict De la Fuente of theft, as well as organized criminal activity through theft, the State was required to prove that he had no intention of fulfilling his obligations under the contracts, and his promises to perform were

"merely a ruse to accomplish theft by deception." *See King v. State*, 17 S.W.3d 7, 15 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd).

■ The record reflects that De la Fuente intended to deceive the clients who paid him money to remodel their homes at the time the money was paid. Almost all of the complainants were induced to hire De la Fuente based on his eye-catching full-page phonebook advertisements which falsely promised a licensed, bonded, and insured company with over twenty years of experience. In many cases, the ads contained false or nonexistent addresses that prevented the clients from locating De la Fuente after he abandoned the remodeling project. He failed to tell the complainants that the list of references he gave them was comprised of his relatives, not former clients. He either told clients, or implied, that his various companies were affiliated with larger, reputable companies. In many instances, De la Fuente identified himself and his associates by false names. He even took clients to his own home and pretended it was a former client's home that he had remodeled, hoping to entice the client to hire him. Many of the complainants testified that De la Fuente became very difficult to contact after they made a partial or complete payment. Also, the investigation into De la Fuente's "business" did not uncover any industrial equipment or tools with which to perform large-scale remodeling projects, indicating that De la Fuente never intended to complete the work he contracted to do. Based on this evidence, we conclude there is legally and factually sufficient evidence to support a finding that De la Fuente acted with the requisite criminal intent to commit theft by deception. *See Webb v. State*, 752 S.W.2d 208, 210 (Tex.App.-Houston [1st Dist.] 1988, pet. ref'd) (where down payment is voluntarily made, there must

be proof of deception, not mere failure to perform, to support theft conviction).

### *Individual or Aggregate Thefts*

De la Fuente next asserts the evidence is legally and factually insufficient to support a finding that he is guilty of (1) the twenty-five individual thefts alleged in the indictment, or (2) theft in an aggregate value of $200,000 or more. De la Fuente argues that the State was required to prove all twenty-five paragraphs in the indictment, including each and every theft within the alleged monetary range; in the alternative, he argues that if the State was only required to prove an aggregate amount, then the aggregate amount proved was less than $200,000. Count II of the indictment contained twenty-five paragraphs[1] alleging that De la Fuente committed theft by deception from the particular named complainants in the particular monetary range. Count II further stated, "[a]nd it is further presented in and to said Court that all of the said amounts were obtained pursuant to one scheme and continuing course of conduct, and the aggregate value of the property obtained was TWO HUNDRED THOUSAND DOLLARS ($200,000) OR MORE." De la Fuente maintains that the State failed to prove that the amounts stolen fell within the alleged monetary range in all but three paragraphs of the indictment. In support, De la Fuente prepared a table reflecting each complainant; he reasons that because in each instance some work was performed, or some money was refunded in connection with a "settlement," there is no amount of money owed within the range alleged in the indictment. He claims that because the jury charge used the conjunctive word "and," the State was required to

prove beyond a reasonable doubt that he committed all twenty-five thefts in the amounts alleged. *See Hernandez v. State,* 841 S.W.2d 569, 571 (Tex.App.-Eastland 1992, pet. ref'd) (holding that, by failing to object to charge, State was required to prove all nine thefts listed in the conjunctive before jury was authorized to convict defendant of aggregated theft offense). We disagree.

When a defendant is charged with committing multiple thefts over a period of time, the State may choose to aggregate the thefts pursuant to Section 31.09 of the Penal Code, which provides, "[w]hen amounts are obtained in violation of [Chapter 31 Theft] pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." TEX. PENAL CODE ANN. § 31.09 (Vernon 2003). An indictment that alleges aggravated theft gives the defendant fair notice of the charges against him. *Lehman v. State,* 792 S.W.2d 82, 84–85 (Tex.Crim. App.1990); TEX.CODE CRIM. PROC. ANN. arts. 21.11, 21.04 (Vernon 1989) (purpose of indictment is to give the defendant notice of the particular offense with which he is charged, and enable the court upon conviction to pronounce the proper judgment; indictment must also be specific enough to enable the accused to plead the judgment in bar of any prosecution for the same offense). Where an indictment charges an individual with the appropriation of property in an aggregated amount pursuant to one scheme or continuing course of conduct, the State is not required to prove each individual appropriation. *Lehman,* 792 S.W.2d at 84; *Dickens v. State,* 981

---

**1.** There are actually twenty-eight thefts alleged in the indictment, but the State waived three.

S.W.2d 186, 188 n. 4 (Tex.Crim.App.1998). The evidence is sufficient if the State shows the defendant illegally appropriated enough property to meet the aggregated value alleged. *Lehman,* 792 S.W.2d at 84 ("[o]nce the defendant has been given proper notice that he must prepare to defend himself against a charge that he has stolen a certain 'bundle' of property, there is no reason that he should be acquitted if the evidence shows him guilty of stealing enough of the 'bundle' to make him guilty of the offense charged."); *Lee v. State,* 29 S.W.3d 570, 575 (Tex.App.-Dallas 2000, no pet.). Accordingly, even assuming *arguendo* that each individual theft was not proved in this case, De la Fuente's argument that the State was required to prove all twenty-five thefts is erroneous. *See Johnson v. State,* 187 S.W.3d 591, 604 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd) (State need not show that the accused stole every piece of property described in the indictment in order to secure a valid conviction); *see also Harrell v. State,* 834 S.W.2d 540, 543 (Tex.App.-Houston [14th Dist.] 1992, pet. ref'd) (where indictment in aggravated theft case alleged eighty-three checks were stolen in one scheme, State only had to prove aggregated value, not each individual theft).

▪ The record contains legally and factually sufficient evidence that De la Fuente stole at least $200,000 during his home remodeling scheme. All twenty-five complainants testified to the amounts they paid De la Fuente, and stated they would not have paid him if they had known he was not going to finish the projects. De la Fuente did not present any testimony contradicting the amounts paid to him, and the amounts testified to by the complainants were supported by the written remodeling proposals. The amounts are summarized below:

| | Complainant/Witness | Amount paid | "Refund" |
|---|---|---|---|
| 1 | Castillo | $ 8,000.00 | $0.00 |
| 2 | Moseley | $ 5,967.00 | $0.00 |
| 3 | Minge | $ 3,996.00 | $0.00 |
| 4 | Weininger | $ 9,120.00 | $ 4,500.00 |
| 5 | Cunningham | $29,102.00 | $12,000.00 |
| 6 | McClendon | $20,000.00 | $0.00 |
| 7 | Kramer | $ 8,750.00 | $ 8,500.00 |
| 8 | Perez | $ 4,650.00 | $0.00 |
| 9 | Flores | $19,062.00 | $0.00 |
| 10 | Stuteville | $ 9,645.00 | $0.00 |
| 11 | Chamberlain | $44,880.00 | $0.00 |
| 12 | Pelletier | $ 7,134.00 | $0.00 |
| 13 | Ramirez | $ 7,650.00 | $0.00 |
| 14 | Whitehead | $ 8,790.00 | $0.00 |
| 15 | McGee | $12,757.00 | $0.00 |
| 16 | Yeary | $ 4,500.00 | $0.00 |
| 17 | Peters | $ 6,700.00 | $ 4,500.00 |
| 18 | Hillje | $ 5,250.00 | $0.00 |
| 19 | Leslie | $ 6,000.00 | $0.00 |
| 20 | Edwards | $ 7,714.00 | $ 3,007.00 |
| 21 | Aragon | $ 1,925.00 | $0.00 |
| 22 | Arredondo | $21,625.00 | $0.00 |
| 23 | Gwaltney | $20,898.00 | $0.00 |
| 24 | Blair | $12,728.50 | $0.00 |
| 25 | Medrano | $15,000.00 | $ 3,000.00 |
| | **TOTAL** | **$301,843.50** | **$35,507.00** |

As noted, *supra,* the jury could have reasonably inferred from De la Fuente's conduct that he never intended to complete the remodeling projects at the time he took the money, and the record clearly contains sufficient evidence that the aggregate amount of money taken from the complainants was more than $200,000.[2] Accordingly, we hold the evidence is legally and factually sufficient to support the jury's finding that De la Fuente committed theft in the aggregate value of $200,000 or more.

### Engaging in Organized Criminal Activity by Committing Theft

▪ Finally, De la Fuente contends the evidence was legally and factually insufficient to support a finding that he engaged in organized criminal activity be-

---

**2.** By our calculations, the total amount of money the complainants paid to De la Fuente was $301,843.50. Even assuming the money De la Fuente refunded to the complainants can be "forgiven" as he argues, the total amount taken during the scheme still totals $266,336.50.

cause there was no proof that he acted in combination with two or more people to commit theft. *See* TEX. PENAL CODE ANN. § 71.02(a)(1) (person commits the offense of engaging in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, . . . he commits or conspires to commit . . . theft"). A "combination" means three or more people who collaborate in carrying on criminal activities. TEX. PENAL CODE ANN. § 71.01(a) (Vernon 2003). Participants in the combination need not know each other's identity, and membership in the combination may change from time to time. TEX. PENAL CODE ANN. § 71.01(a)(1), (2); *Ledet v. State,* 177 S.W.3d 213, 218–19 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd). There must be evidence that the participants in the combination agreed to "work together in a continuing course of criminal activities." *Nguyen v. State,* 1 S.W.3d 694, 697 (Tex.Crim.App.1999). However, the acts which prove the "combination" need not be criminal offenses. *Id.; Barber v. State,* 764 S.W.2d 232, 235 (Tex.Crim.App. 1988). Finally, direct evidence of intent is not required, and circumstantial evidence will suffice. *Hart v. State,* 89 S.W.3d 61, 64 (Tex.Crim.App.2002).

▮ The record contains legally and factually sufficient evidence that a combination existed, and that De la Fuente intended to, and did, participate in the combination and its profits. *See id.* at 63–64. As detailed, *supra,* the jury heard evidence from the complainants that De la Fuente did not work alone in soliciting and beginning the remodeling projects. Almost every complainant testified that Apolonio Hernandez, whether identified by that name or not, was involved in the contract or performed work on their home. Many of the complainants were told that Bernard Beckingham owned the remodeling compa-

ny at issue, and they had to obtain any refund from him. Sergeant Sides testified that the investigation showed that De la Fuente worked closely with Apolonio Hernandez and Bernard Beckingham, and that his brother, Rudy De la Fuente, and his son, Joshua De la Fuente, also were involved in some of the projects. Investigator Strader testified that during the scheme De la Fuente worked with Joshua De la Fuente, Rudy De la Fuente, Bernard Beckingham, and Apolonio Hernandez. She also stated that Ofelia De la Fuente, De la Fuente's wife, answered the phone for some of the companies and was listed as Vice President of "Broadway Remodeling" in the application for the phonebook ad. Based on this evidence, the jury could have found beyond a reasonable doubt that De la Fuente intended to and did act in combination with two or more individuals to commit the offense of theft. Accordingly, we overrule De la Fuente's challenge to the sufficiency of the evidence to support his conviction for engaging in an organized criminal activity.

### CONCLUSION

Based on the foregoing reasons, the judgment of the trial court is affirmed.