# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-09-00652-CR

---

**John Bender, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NO. D-1-DC-08-904109, HONORABLE CHARLES E. MILLER JR., JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

A jury found appellant John Bender guilty of theft and misapplication of fiduciary property. *See* Tex. Penal Code Ann. §§ 31.03, 32.45 (West Supp. 2010). The jury also found that the amounts stolen and misapplied had an aggregate value of $200,000 or more. *See id*. §§ 31.09, 32.03 (West 2003). The trial court assessed punishment for each count at twenty years' imprisonment.

Appellant, an attorney, knowingly and voluntarily waived the assistance of counsel on appeal. In his pro se brief, appellant contends that the trial court erred by overruling his motion to quash the indictment and his pretrial motion in limine. He also contends that the evidence is insufficient to support the guilty verdicts. Finally, appellant contends that he has been unconstitutionally convicted and punished for debt. We overrule these contentions and affirm the convictions.

## BACKGROUND

In 1999, appellant was practicing business and tax law in Austin. Among his tax clients was Chris Hubner, a former law school classmate. On appellant's suggestion, Hubner had invested in Austin Computer Diagnostics (ACD), an Austin medical imaging business for which appellant had done much of the legal work. Hubner's investment in ACD proved to be profitable.

In October 1999, Karl Hubner, a radiologist and expert in nuclear medicine, told his son Chris that he believed Austin was a promising market for a positron emissions tomography (PET) scanner, a then-new medical imaging device used to locate and identify cancerous tissue. Knowing appellant's experience with ACD, Chris Hubner arranged a meeting between his father and appellant to discuss the possibility of establishing a PET business in Austin. Appellant was enthusiastic about the idea, and he agreed to prepare the legal documents required to set up the business entities and solicit investments.

As structured by appellant, the operating business was a limited partnership, P.E.T. Imaging, Ltd. (P.E.T.). A corporate entity, P.E.T. Imaging GP, Inc. (GP), was the general partner of P.E.T. Appellant and the Hubners were the named managers of GP, but the Hubners had little or no day-to-day involvement in the business. It was undisputed at trial that appellant was effectively the sole manager of P.E.T. Appellant was also the designated manager of a related management services organization, P.E.T. MSO, Ltd. (MSO).

Appellant prepared the necessary offering documents and began soliciting investments in August 2000. At the same time, appellant leased office space and hired several employees, including technicians to operate the scanner. Appellant leased the scanner from a

2

company known as ADAC, with an initial payment by him of $129,000.[1]  Appellant told Chris Hubner that he was investing in P.E.T. using money borrowed against stock worth several million dollars that he had received in a lawsuit settlement.  The first patients were scanned in September 2000.

Units of ownership in the P.E.T. and MSO limited partnerships were sold to investors for $5000 per unit.  In the last five months of 2000, a total of $260,000 was invested by persons other than appellant:  $20,000 by Chris and Georjean Hubner, $50,000 by Karl Hubner, $25,000 by Sibyll Hubner, $5,000 by Mark and Lisa Burr, $150,000 by Donnis Doyle and Bill Scholl, and $10,000 by Mitchell and Shelley Taylor.  In the spring of 2001, Chris and Georjean Hubner invested an additional $105,000, Sibyll Hubner invested an additional $25,000, and Philipp Hubner invested $30,000.  Doyle, Mark Burr, Mitchell Taylor, and Philipp Hubner testified that they were not told that appellant was taking money from the business and that they would not have invested had they known.

In addition to these investments, Leona Jeffcoat made a personal loan to appellant of $50,000 in July 2001.  Appellant testified that he told Jeffcoat at the time that he needed the money "for the business."  The evidence shows that appellant deposited $40,000 of Jeffcoat's money in a P.E.T. bank account and the remaining $10,000 in his personal account.

Although P.E.T.'s volume of business was strong initially, it dropped in 2001 when one of the large oncology groups in Austin acquired its own scanner and stopped referring patients to P.E.T.  Meanwhile, appellant made no lease payments to ADAC, and the scanner was repossessed

---

[1] Appellant insisted at trial that the arrangement with ADAC was not a lease, but a purchase order.  The distinction is irrelevant to our decision and this opinion.

in December 2001. Without a scanner, the business was forced to close and the employees were laid off. Appellant did not tell his investors that the scanner had been repossessed for nonpayment. Instead, he told them that referring physicians were not happy with the images the ADAC scanner produced, and that he had arranged to acquire a better machine from General Electric. Several witnesses, including Karl Hubner, confirmed that the GE machine was, in fact, superior to the ADAC scanner.

In December 2001, appellant met with Robert Icenhauer-Ramirez, Chris Hubner's former law partner and another of appellant's tax clients, to discuss an investment in P.E.T. Icenhauer-Ramirez testified that during this meeting, appellant told him that no one, including appellant, was taking any money out of P.E.T. until it became profitable. Icenhauer-Ramirez agreed to make an initial investment of $25,000. The following month, appellant told Icenhauer-Ramirez that P.E.T. needed money to acquire the new scanner. Icenhauer-Ramirez agreed to wire $150,000 to GE for the initial payment. Of this amount, $50,000 was a thirty-day loan by Icenhauer-Ramirez to P.E.T. and the remaining $100,000 constituted a further investment in P.E.T.: $25,000 by Icenhauer-Ramirez and $75,000 by Chris and Karl Hubner, who reimbursed Icenhauer-Ramirez that amount in exchange for additional units.

The GE scanner arrived in early 2002, and the business reopened. When Icenhauer-Ramirez later asked appellant to explain why his $50,000 loan had not been repaid, appellant told him that business was slow. Appellant also reported that there was a cash-flow problem due to delayed reimbursements from insurance companies. In March 2002, Chris and Karl Hubner and Icenhauer-Ramirez agreed to co-sign a $50,000 bank loan to P.E.T. In April,

Chris Hubner was informed by the bank that P.E.T. was not making its loan payments. A GE employee testified that P.E.T. defaulted on its scanner lease after making only one payment.

In June 2002, Icenhauer-Ramirez began asking to see P.E.T.'s books. Appellant eventually gave him what was referred to as a ledger that purported to show all of the expenditures appellant had made on P.E.T.'s behalf. In February 2003, Chris Hubner and Icenhauer-Ramirez demanded to see the business checkbook. Appellant claimed that he did not have it, but he did turn over copies of P.E.T. bank statements. These statements showed that substantial amounts of money had been transferred from the P.E.T. account to an account appellant admitted was his. When asked by Icenhauer-Ramirez to explain these transfers, appellant remained silent. Hubner testified that during the February 2003 meeting, appellant denied taking any money out of P.E.T. for himself.

Icenhauer-Ramirez testified that appellant later delivered to him four boxes containing what appellant said were P.E.T.'s business records. Icenhauer-Ramirez eventually gave these records to the district attorney.

Belinda Murphy, a certified public accountant employed by the district attorney as a forensic analyst, testified that she compared the ledger and bank statements appellant gave to Hubner and Icenhauer-Ramirez to bank records subpoenaed by the State.[2] She said that the copies of bank statements appellant gave to Hubner and Icenhauer-Ramirez were altered or incomplete, and often omitted entries showing transfers from the business accounts to appellant's accounts. She also testified that the ledger appellant gave to Icenhauer-Ramirez in June 2002 was inaccurate. The

---

[2] Murphy examined statements for six accounts belonging to P.E.T, GP, and MSO, and five accounts belonging to appellant.

5

subpoenaed bank records showed that payments entered in the ledger as business expenses had in fact been made to appellant.

Murphy testified that the subpoenaed bank records reflected that appellant withdrew $932,000 from the P.E.T. accounts by check, electronic transfer, and cash withdrawal.[3] Of this amount, appellant took $207,000 in cash, $115,000 was deposited in appellant's brokerage account, $367,000 was deposited in appellant's attorney-at-law account, $80,000 was deposited in appellant's client trust account (IOLTA), and $143,000 was deposited in appellant's personal checking account. Murphy testified that she could not account for the remaining $20,000.

Marshall Vogt, a certified public accountant and the district attorney's senior forensic analyst, testified that he also examined the subpoenaed bank records. According to Vogt's analysis, appellant withdrew $129,000 from P.E.T. accounts during the last four months of 2000, $452,000 in 2001, $329,000 in 2002, and $18,000 during January and February 2003. The monthly withdrawals ranged from a high of $73,500 in February 2001 to a low of $415 in February 2003. January 2002, when appellant withdrew $9900, was the only other month in which appellant withdrew less than $10,000 from P.E.T. accounts.

Vogt testified that ninety-nine percent of the checks appellant wrote to himself on the P.E.T. accounts had no memo notations indicating the purpose of the payment. Vogt also testified that he was unable to find any documentation justifying the payments to appellant in the four boxes of business records that appellant gave to Icenhauer-Ramirez in February 2002.

---

[3] We have rounded the amounts to the nearest thousand.

Appellant did not deny taking the $932,000. Instead, he testified that all of the payments to himself were proper. Appellant said that he had paid himself director's fees of $45,000, management fees of $48,000, legal and accounting fees of $45,000, and syndication fees of $50,000. Other payments were to reimburse him for expenses he had incurred on P.E.T.'s behalf, including $12,000 for furniture and fixtures, $31,000 for a work station, and $99,000 for sales taxes. Appellant pointed out that these payments were consistent with the proposed application of investment proceeds contained in the private placement memorandum provided to the investors. Appellant asserted that the remainder of the $932,000 constituted reimbursement either for business expenses he had incurred or money he had advanced to the business. Appellant denied telling the other investors that he would not take money out of the business until it was profitable.

Appellant also acknowledged diverting money from P.E.T. to a similar scanner business he was attempting to start in Houston. He also confirmed Icenhauer-Ramirez's testimony that appellant had discussed the possibility of starting a scanner operation in Houston, but that the Austin investors had disapproved. Appellant admitted that he nevertheless spent $43,000 of P.E.T. money to pay rent in Houston and an additional unspecified sum to pay consultants. Appellant also conceded that although he was an owner of the Houston business, the other investors in P.E.T. did not have an interest in that enterprise.

**MOTION TO QUASH AND MOTION IN LIMINE**

In two points of error, appellant contends that the trial court erred by overruling his motion to quash the indictment and his motion in limine. First, appellant urges that the indictment should have been quashed because it failed to give him adequate notice. Next, appellant contends

7

that by overruling the motion to quash and the motion in limine, the trial court "grant[ed] the State a blanket exemption to the parol evidence rule."

**Notice**

Count one of the indictment alleged:

[B]eginning on or about the 1st day [of] August, 2000 and continuing through on or about the 1st day of February, 2003, [appellant] did then and there unlawfully appropriate, by acquiring and otherwise exercising control over property, to-wit: United States currency from Dr. Mark Burr, Lisa Burr, Chris Hubner, Georjean Hubner, Dr. Karl Hubner, Philipp Hubner, Sibyll Hubner, Robert Icenhauer-Ramirez, Bill Scholl, Donnis Doyle, Mitchell Taylor, Shelley Taylor, Leona Jeffcoat and P.E.T. Imaging, Ltd, the owners, without the effective consent of the owners, by deception, and with intent to deprive the owners of the property, by creating and confirming by words and conduct a false impression of fact, not believing it to be true, that was likely to and did affect the judgment of another in the transaction, to wit: [appellant] represented to the owners that the P.E.T. Imaging funds would be expended on the business operation of P.E.T. Imaging, when in truth and in fact, [appellant] expended the said P.E.T. Imaging funds in a manner inconsistent with the business operation of P.E.T. Imaging.

*See* Tex. Penal Code Ann. § 31.03(a), (b)(1) (West Supp. 2010); *see also id*. § 31.01(1)(A), (3)(A). Count one further alleged that the stolen property had an aggregate value of $200,000. *See id*. § 31.09 (West 2003). It also alleged that appellant had been charged with the same offense in two prior indictments, both of which were still pending. *See* Tex. Code Crim. Proc. Ann. art. 12.05(b) (West 2005).

Count two of the indictment alleged:

[O]n or about the 1st day of August 2000 and continuing through on or about the 1st day of February 2003, [appellant] intentionally, knowingly and recklessly misappl[ied] property, to-wit: lawful United States currency, that [appellant] held as a fiduciary, but not as a commercial bailee, in a manner that involved substantial risk

8

of loss of the property to Dr. Mark Burr, Lisa Burr, Chris Hubner, Georjean Hubner, Dr. Karl Hubner, Philipp Hubner, Sibyll Hubner, Robert Icenhauer-Ramirez, Bill Scholl, Donnis Doyle, Mitchell Taylor, Shelley Taylor, Leona Jeffcoat and P.E.T. Imaging, Ltd, the owners of said property, by dealing with said property contrary to an agreement under which [appellant] held the property: to wit: [appellant] expended the PET Imaging funds in a manner inconsistent with the business operation of PET Imaging, LTD.

*See* Tex. Penal Code Ann. § 32.45(a), (b) (West Supp. 2010). Count two further alleged that the amounts misapplied had an aggregate value of $200,000. *See id*. § 32.03 (West 2003).

Appellant contends that the indictment was deficient because the two counts did not specify the transactions by which the alleged unlawful appropriations and misapplications were accomplished. In *State v. Moff*, a misapplication-of-fiduciary-property prosecution, the court of criminal appeals held that the trial court did not err by granting the defendant's motion to quash the indictment because it did not allege the specific transactions constituting the offense. 154 S.W.3d 599, 603-04 (Tex. Crim. App. 2004). In *Kellar v. State*, an aggregated theft prosecution, the court of criminal appeals stated that the defendant had a due process right to notice of the specific instances of theft on which the State based its allegations. 108 S.W.3d 311, 313-14 (Tex. Crim. App. 2003). In both opinions, however, the court wrote that the notice to which the defendant was entitled did not necessarily have to be given in the indictment. *See Kellar*, 108 S.W.3d at 313 ("[T]his due process requirement may be satisfied by means other than the language in the charging instrument."); *see also Moff*, 154 S.W.3d at 603 (quoting *Kellar*). In *Kellar*, the court held that the defendant's right to notice had been satisfied because, during a series of pretrial hearings, the prosecutor gave defense counsel access to four binders documenting 149 transactions showing instances of theft by the defendant, itemized lists of transactions on which the State intended to rely,

9

and bound copies of business records and affidavits to be introduced as evidence at trial. *Kellar*, 108 S.W.3d at 314.

The indictment in question was the third to be filed accusing appellant of these offenses. In count one of the second indictment, cause number D-1-DC-05-900841, the State listed the amounts appellant had unlawfully appropriated from each named complainant within a range (for example, $20,000 or more but less than $100,000). In count two of the second indictment, the State listed 403 individual transactions that allegedly constituted misapplications of fiduciary property, giving the date and amount of each. In his memorandum in support of his motion to quash, appellant stated that using the detailed allegations contained in the second indictment, he had conducted a forensic audit of the business records in order to prepare his defense. Appellant complained that the State had undercut his defense by omitting the detailed allegations in the third indictment, leaving the defense in the dark as to the evidence on which the State would rely. At the hearing on the motion to quash, defense counsel repeated this complaint, telling the court that "we had a forensic audit done of the transactions identified by the State in the prior indictment as well as the investor transactions, investor money transactions in the prior indictment." In response, the prosecutor told the court that "the specific transactions set out in the second indictment are the bulk of the State's case." She added that there were "a few more [transactions] than that, and we can give the Defense discovery on that."

At trial, appellant expressed no surprise regarding the amounts said to have been unlawfully appropriated from the investors. As for the alleged misapplications, a defense expert testified that he had reviewed approximately 480 transactions identified by the State as being

10

unauthorized. During his own testimony, appellant introduced exhibits he had prepared to explain how the allegedly unlawful transactions had a legitimate purpose.

Appellant asserts generally that he was entitled to greater notice, but he does not explain how the alleged lack of notice impaired his defense. On this record, no constitutional notice violation is shown with regard to the individual transactions constituting the alleged misappropriations and misapplications.

Appellant contends that the theft count did not give him notice of the misstatements by which he deceived the investors. In a theft prosecution, the State must, in response to a motion to quash, allege the statutory manner by which the complainant's consent was rendered ineffective. *Geter v. State*, 779 S.W.2d 403, 407 (Tex. Crim. App. 1989). In this case, count one alleged that the complainants' consent was induced by deception and, more specifically, by appellant's creating or confirming by words and conduct a false impression of fact that was likely to and did affect the complainants' judgment. *See* Tex. Penal Code Ann. § 31.01(1)(A), (3)(A). Further, the indictment alleged that the deception consisted of "[appellant's] represent[ing] to the owners that the P.E.T. Imaging funds would be expended on the business operation of P.E.T. Imaging, when in truth and in fact, [appellant] expended the said P.E.T. Imaging funds in a manner inconsistent with the business operation of P.E.T. Imaging." We conclude that these allegations gave appellant adequate notice of the alleged misstatements by which he deceived the investors and rendered their consent ineffective.

Appellant further complains that the allegation in both counts that he expended P.E.T. funds "in a manner inconsistent with the business operations" of the enterprise was inadequate. He urges that the indictment should have specifically alleged how each individual transaction was

11

inconsistent with P.E.T.'s business operations or exceeded the scope of appellant's authority to manage the business. As noted above, however, appellant received a list of the transactions in question, conducted a forensic audit of the transactions at issue, and offered evidence that each transaction was a proper business expenditure. Once again, no violation of the constitutional right to notice is shown.

Although this does not constitute a notice defect, appellant complains under this point of error that it was improper to allege ownership in P.E.T. He contends that ownership should have been alleged in some natural person acting for the partnership. The penal code provides that an owner may be an individual, corporation, or association. Tex. Penal Code Ann. § 1.07(a)(35), (38) (West Supp. 2010). When property is owned by an entity other than a natural person, ownership may be alleged in either the entity or an individual acting as "special owner." *Harrell v. State*, 852 S.W.2d 521, 523 (Tex. Crim. App. 1993). No error is shown.

Finally, appellant complains of the absence of a tolling paragraph. There was such a paragraph in count one, the theft count. None was required in count two, as the third indictment was filed less than seven years after the alleged misapplications ended. *See Tita v. State*, 267 S.W.3d 33, 35 n.1 (Tex. Crim. App. 2008); Tex. Code Crim. Proc. Ann. art. 12.01(3)(A) (West Supp. 2010).

Point of error one is overruled.

**Parol evidence**

In his second point, appellant urges that the indictment should have been quashed because the allegation that he expended funds in a manner inconsistent with P.E.T.'s business

12

operations rested on parol evidence. Appellant argues at length that parol evidence was not admissible to alter the terms of the written limited partnership agreement and the private placement memorandum by which the units of P.E.T. were offered for sale to the investors.

We find no reference to parol evidence in appellant's motion to quash, although there was some discussion of it in appellant's memorandum in support of the motion. Assuming that the issue was raised in the motion to quash, no error is shown. The proper function of a motion to quash is to test the facial validity of the indictment. *State v. Rosenbaum*, 910 S.W.2d 934, 947 (Tex. Crim. App. 1994) (Clinton, J., dissenting) (op. adopted on reh'g). In a pretrial setting, there is no authority for an accused to raise or for a trial court to determine the sufficiency of the evidence to support or defeat an alleged element of the offense. *Id*. at 948.

Appellant also raised the parol evidence issue in his pretrial motion in limine. By this motion, appellant asked the trial court to instruct the State's counsel to obtain a ruling outside the jury's presence before mentioning or alluding to, among other things, "[a]ny and all evidence of any alleged verbal agreements between any investor in Pet Imaging, Ltd. and [appellant] and/or alleged verbal 'representations' made to any investor by [appellant]." This portion of the motion in limine was denied.

The grant or denial of a pretrial motion in limine is a preliminary ruling only and normally preserves nothing for appellate review. *Geuder v. State*, 115 S.W.3d 11, 14-15 (Tex. Crim. App. 2003). This is because the court's ruling is subject to reconsideration throughout the course of the trial. *Norman v. State*, 523 S.W.2d 669, 671 (Tex. Crim. App. 1975). The denial of appellant's motion in limine did not, in itself, preserve appellant's contention that parol evidence was improperly admitted. *See Webb v. State*, 760 S.W.2d 263, 275 (Tex. Crim. App. 1988).

13

The parol evidence rule is a substantive contract law principle by which evidence of inconsistent prior or contemporaneous agreements may not be used to vary or contradict the unambiguous language in the parties' written contract. *National Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). Appellant cites code of criminal procedure article 1.27 to support his claim that the parol evidence rule applies in criminal prosecutions. Tex. Code Crim. Proc. Ann. art. 1.27 (West 2005). But that statute merely provides that common law rules of procedure apply in the absence of a statutory rule. The parol evidence rule is not a procedural rule.

Under count one, appellant was accused of unlawfully appropriating the complainant's money by deception. "Deception" means creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true. Tex. Penal Code Ann. § 31.01(1)(A) (West Supp. 2010). Under count two, appellant was accused of misapplying property he held as a fiduciary. "Misapply" means dealing with property contrary to an agreement under which the fiduciary holds the property. *Id*. § 32.45(a)(2)(A). Appellant cites no pertinent authority to support his contention that the State could offer no evidence of appellant's deceptive conduct and misapplication of property other than that reflected in the written documents provided to the complainants at the time they invested.

Point of error two is overruled.

**SUFFICIENCY OF EVIDENCE**

In points of error three and four, appellant contends that the evidence is legally and factually insufficient to sustain the findings of guilt. We no longer employ distinct legal and factual sufficiency standards when reviewing the sufficiency of the evidence to sustain

14

a criminal conviction. Instead, the only standard for determining whether the evidence proves a defendant's guilt beyond a reasonable doubt is the *Jackson* due process standard. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under *Jackson*, the question presented is whether, after viewing all the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. 443 U.S. at 319. The reviewing court may impinge on the trier of fact's discretion only to the extent necessary to guarantee the fundamental protection of due process of law. *Id*.

**Theft**

Under count one, it was the State's burden to prove that appellant, pursuant to one scheme or continuing course of conduct, unlawfully appropriated $200,000 or more from the complainants by creating or confirming by words or conduct a false impression of fact that was likely to affect the complainants' judgment in the transaction and that appellant did not believe to be true: "that P.E.T. Imaging funds would be expended on the business operation of P.E.T. Imaging, when in truth and in fact, [appellant] expended the said P.E.T. Imaging funds in a manner inconsistent with the business operation of P.E.T. Imaging." It was not necessary for the State to prove an unlawful appropriation from each named complainant; the evidence is sufficient if the State proved that appellant unlawfully appropriated a total of at least $200,000 from one or more of the named complainants. *See Lehman v. State*, 792 S.W.2d 82, 84 (Tex. Crim. App. 1990); *De La Fuente v. State*, 264 S.W.3d 302, 318-19 (Tex. App.—San Antonio 2008, pet. ref'd).

**Aggregation.** It was undisputed that during the time period alleged in the indictment, the Hubners, Mark and Lisa Burr, Mitchell and Shelly Taylor, Bill Scholl and Donnis Doyle, and Robert Icenhauer-Ramirez invested a total of $545,000 in either P.E.T. or MSO.[4] There was also no dispute that these investments were made pursuant to a single scheme or course of conduct by which appellant solicited investments in P.E.T. and MSO.

**Ownership.** Appellant contends that the complainants, as limited partners, did not own the partnership assets. This contention is irrelevant to the theft count. Appellant was not accused of stealing partnership assets from the complainants. Rather, appellant was accused of unlawfully appropriating the money invested by the complainants in the partnerships.

**Appropriation and intent to deprive.** Most property transactions involve the acquisition of another's property with the intent to deprive him or her of it. *See McClain v. State*, 687 S.W.2d 350, 354 (Tex. Crim. App. 1985). That is plainly true of appellant's acquisition of the money the complainants invested in P.E.T. and MSO. What makes an appropriation unlawful is the lack of effective consent by the owner.

**Effective consent.** The State alleged that the complainants' consent to appellant's appropriation of the money they invested in P.E.T. and MSO was not effective because they were induced to invest by appellant's deceptive words and conduct. The deception alleged in the

---

[4] In addition, Icenhauer-Ramirez loaned $50,000 to P.E.T. and Leona Jeffcoat loaned $50,000 to appellant "for the business." We have not taken these loans into account in determining the sufficiency of the evidence. In our discussion of points of error three and four, any reference to "the complainants" means the named investors in the limited partnerships and does not include either Jeffcoat or P.E.T. Imaging.

16

indictment was that, contrary to the representations he made to the complainants, appellant expended P.E.T. funds in a manner inconsistent with the proper operation of the business.

Icenhauer-Ramirez testified that before he invested in P.E.T., appellant told him that he, appellant, would receive no salary or fees from P.E.T. until the business was profitable. Other investors testified that appellant did not tell them that he was taking money from the business, and that they would not have invested if they had known that he was doing so. Appellant contends that this testimony should be given no weight because it is parol. We have already explained why appellant's reliance on the parol evidence rule is mistaken. Further, we consider all the evidence before the jury in determining the sufficiency of the evidence. *Garcia v. State*, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994). Finally, even if we were to disregard appellant's oral statements to the investors, the written partnership agreement obliged appellant, as manager of the general partner, to expend P.E.T. funds only for the benefit of the partnership. Appellant does not refer us to any provision in the written agreement that permitted him to expend P.E.T. funds for other than legitimate business purposes.

Appellant contends that the complainants were not deceived because the private placement memorandum disclosed that proceeds from the offering would be used to pay offering expenses, startup costs, and operating expenses. This argument assumes that the $932,000 that appellant admittedly paid to himself from the P.E.T. accounts was, as he testified, payment for services rendered to the partnership or reimbursement for legitimate business expenses. The jury was not required to believe appellant's testimony, however. In light of the evidence that appellant hid the payments to himself and gave Hubner and Icenhauer-Ramirez false documents when they demanded an accounting, the jury could reasonably infer that there was no legitimate business

17

purpose for these payments. Moreover, appellant conceded that he withdrew hundreds of thousands of dollars from the partnership at a time when he was not making the lease payments on the scanners. The jury could reasonably conclude that by paying himself while allowing the ADAC scanner that was crucial to the business to be repossessed, appellant expended P.E.T. funds in a manner that was not consistent with P.E.T.'s business operations. Appellant's argument also fails to take into account his admission that he used more than $43,000 of P.E.T. funds to start an unrelated scanning business in Houston, a use of partnership funds that was neither disclosed to the investors nor consistent with P.E.T.'s business operations.

Viewing all the evidence in the light most favorable to the guilty verdict, the jury could rationally have found beyond a reasonable doubt that appellant, by his words and conduct, gave the complainants the false impression that P.E.T. funds would be expended in a manner consistent with P.E.T.'s business operation, not believing it to be true. The jury could also rationally have found that this false impression was likely to and did affect the judgment of one or more of the complainants so as to render ineffective their consent to appellant's appropriation of more than $200,000 they invested in P.E.T. and MSO. The evidence is legally sufficient to sustain the jury's verdict convicting appellant of theft.

**Misapplication of fiduciary property**

Under count two, it was the State's burden to prove that appellant, pursuant to one scheme or continuing course of conduct, intentionally, knowingly, or recklessly misapplied $200,000 or more that he held as a fiduciary for the benefit of the complainants by expending P.E.T. funds in a manner inconsistent with P.E.T.'s business operations and that involved a substantial risk

18

of loss. Once again, the evidence is sufficient if the State proved that appellant misapplied a total of at least $200,000 from one or more of the named complainants. *See Lehman*, 792 S.W.2d at 84; *De La Fuente*, 264 S.W.3d at 318-19.

**Fiduciary.** A "fiduciary" includes an officer or manager carrying on fiduciary functions on behalf of a fiduciary. Tex. Penal Code Ann. § 32.45(a)(1)(D) (West Supp. 2010). Under the terms of the partnership agreement, appellant, as manager and general partner of P.E.T., was accountable to the limited partners as a fiduciary. We do not understand appellant to argue otherwise.

**Ownership.** Appellant urges that the complainants were not shown to be the owners of the partnership assets as alleged in count two. However, the complainants, as limited partners in P.E.T., had a beneficial interest in the partnership assets, and appellant held the partnership assets for the benefit of the complainants. Although it might have been more accurate for the indictment to describe the complainants as "persons for whose benefit the property was held," referring to them as "owners" did not, under the circumstances of this case, give rise to a material variance. *See Gollihar v. State*, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001). An immaterial variance may be disregarded in reviewing the sufficiency of the evidence. *Fuller v. State*, 73 S.W.3d 250, 254 (Tex. Crim. App. 2002).

**Misapplication.** Appellant insists that his withdrawals from the P.E.T. accounts did not violate the agreement under which he held the property because, as manager and general partner, he had "absolute authority" to manage the partnership assets. But under the partnership agreement, appellant had a fiduciary responsibility to exercise his management authority solely for the benefit

of the partnership. Contrary to appellant's assertion, his managerial authority did not permit him to expend P.E.T.'s assets in any manner he saw fit.

As we have already discussed, appellant admitted diverting more than $43,000 of P.E.T. funds to the scanner business in Houston in which P.E.T. had no interest. The evidence shows that appellant withdrew $452,000 from P.E.T. in 2001, the year in which appellant, as manager of P.E.T., made no lease payments on the ADAC scanner, resulting in its repossession. Appellant withdrew another $329,000 in 2002, a year in which appellant made only one lease payment on the GE scanner. Appellant testified that he was entitled to this money, and to the remainder of $932,000 that he admittedly withdrew from P.E.T. accounts, as compensation for services he provided to the partnership or reimbursement for business expenses he personally bore. This claim was contrary to appellant's statement to Icenhauer-Ramirez that he would take no salary or fees from P.E.T. until the business was profitable. The claim was also belied by the evidence that appellant hid the payments to himself, going so far as to give Hubner and Icenhauer-Ramirez altered bank statements and a ledger in which payments to appellant were disguised. The evidence also shows that the boxes of business records appellant later produced contained no receipts or other documents justifying the payments to appellant. Once again, the jury was not obliged to credit appellant's exculpatory testimony. The jury could rationally infer that there was no legitimate business purpose for the withdrawals appellant made from the P.E.T. accounts and that these withdrawals constituted a misapplication of P.E.T. assets.

Viewing all the evidence in the light most favorable to the guilty verdict, the jury could rationally have found beyond a reasonable doubt that appellant, pursuant to one scheme or continuing course of conduct, intentionally misapplied more than $200,000 that he held as a

20

fiduciary for the benefit of the complainants by expending P.E.T. funds in a manner that was contrary to the agreement under which he held the funds, was inconsistent with P.E.T.'s business operations, and involved a substantial risk of loss. The evidence is legally sufficient to sustain the jury's verdict convicting appellant of misapplying fiduciary property.

Points of error three and four are overruled.

## PROSECUTION FOR DEBT

Appellant's last point of error concerns the evidence of the $50,000 loan Leona Jeffcoat made to appellant in July 2001 and the $50,000 loan Icenhauer-Ramirez made to P.E.T. in January 2002. Appellant argues that the admission of this evidence and the consideration of these loans by the trial court in assessing punishment violated the constitutional prohibition on imprisonment for debt. *See* Tex. Const. art. I, § 18.

Under the constitution, a prosecution for theft will not lie merely for the nonpayment of a debt. *Howell v. State*, 478 S.W.2d 468, 469 (Tex. Crim. App. 1972). Article I, section 18 does not apply, however, if the loan was procured by false pretext. *Id*. It was the State's contention that Jeffcoat and Icenhauer-Ramirez made the loans based on appellant's false representations regarding his management of P.E.T. and the financial status of the business. It was not appellant's failure to repay the loans that constituted the alleged unlawful appropriation, but the manner in which appellant procured the loans in the first place.

There was ample evidence to support appellant's conviction for theft without regard to the two loans.[5] If the trial court considered appellant's fraudulent procurement of the loans in

---

[5] *See* fn. 4, supra.

assessing punishment, it had the discretion to do so.  *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (West Supp. 2010) (in assessing punishment, consideration may be given to any matter court deems relevant to sentence, including extraneous bad acts shown to have been committed by defendant).  The court did not order payment of restitution in any amount.

Appellant's contention that he has been prosecuted and imprisoned for debt is without merit.  Point of error five is overruled.

The judgments of conviction are affirmed.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed:   April 19, 2011

Do Not Publish