TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00652-CR







John Bender, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT


NO. D-1-DC-08-904109, HONORABLE CHARLES E. MILLER JR., JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



A jury found appellant John Bender guilty of theft and misapplication of fiduciary
property. See Tex. Penal Code Ann. §§ 31.03, 32.45 (West Supp. 2010). The jury also found that
the amounts stolen and misapplied had an aggregate value of $200,000 or more. See id. §§ 31.09,
32.03 (West 2003). The trial court assessed punishment for each count at twenty years'
imprisonment.

Appellant, an attorney, knowingly and voluntarily waived the assistance of counsel
on appeal. In his pro se brief, appellant contends that the trial court erred by overruling his motion
to quash the indictment and his pretrial motion in limine. He also contends that the evidence is
insufficient to support the guilty verdicts. Finally, appellant contends that he has been
unconstitutionally convicted and punished for debt. We overrule these contentions and affirm
the convictions.

BACKGROUND


In 1999, appellant was practicing business and tax law in Austin. Among his tax
clients was Chris Hubner, a former law school classmate. On appellant's suggestion, Hubner had
invested in Austin Computer Diagnostics (ACD), an Austin medical imaging business for which
appellant had done much of the legal work. Hubner's investment in ACD proved to be profitable. 

In October 1999, Karl Hubner, a radiologist and expert in nuclear medicine, told his
son Chris that he believed Austin was a promising market for a positron emissions tomography
(PET) scanner, a then-new medical imaging device used to locate and identify cancerous tissue. 
Knowing appellant's experience with ACD, Chris Hubner arranged a meeting between his father and
appellant to discuss the possibility of establishing a PET business in Austin. Appellant was
enthusiastic about the idea, and he agreed to prepare the legal documents required to set up the
business entities and solicit investments.

As structured by appellant, the operating business was a limited partnership, P.E.T.
Imaging, Ltd. (P.E.T.). A corporate entity, P.E.T. Imaging GP, Inc. (GP), was the general partner
of P.E.T. Appellant and the Hubners were the named managers of GP, but the Hubners had little or
no day-to-day involvement in the business. It was undisputed at trial that appellant was effectively
the sole manager of P.E.T. Appellant was also the designated manager of a related management
services organization, P.E.T. MSO, Ltd. (MSO).

Appellant prepared the necessary offering documents and began soliciting
investments in August 2000. At the same time, appellant leased office space and hired several
employees, including technicians to operate the scanner. Appellant leased the scanner from a
company known as ADAC, with an initial payment by him of $129,000. (1) Appellant told
Chris Hubner that he was investing in P.E.T. using money borrowed against stock worth several
million dollars that he had received in a lawsuit settlement. The first patients were scanned in
September 2000.

Units of ownership in the P.E.T. and MSO limited partnerships were sold to investors
for $5000 per unit. In the last five months of 2000, a total of $260,000 was invested by persons other
than appellant: $20,000 by Chris and Georjean Hubner, $50,000 by Karl Hubner, $25,000 by
Sibyll Hubner, $5,000 by Mark and Lisa Burr, $150,000 by Donnis Doyle and Bill Scholl, and
$10,000 by Mitchell and Shelley Taylor. In the spring of 2001, Chris and Georjean Hubner invested
an additional $105,000, Sibyll Hubner invested an additional $25,000, and Philipp Hubner invested
$30,000. Doyle, Mark Burr, Mitchell Taylor, and Philipp Hubner testified that they were not
told that appellant was taking money from the business and that they would not have invested had
they known.

In addition to these investments, Leona Jeffcoat made a personal loan to appellant of
$50,000 in July 2001. Appellant testified that he told Jeffcoat at the time that he needed the money
"for the business." The evidence shows that appellant deposited $40,000 of Jeffcoat's money in a
P.E.T. bank account and the remaining $10,000 in his personal account.

Although P.E.T.'s volume of business was strong initially, it dropped in 2001 when
one of the large oncology groups in Austin acquired its own scanner and stopped referring patients
to P.E.T. Meanwhile, appellant made no lease payments to ADAC, and the scanner was repossessed
in December 2001. Without a scanner, the business was forced to close and the employees were laid
off. Appellant did not tell his investors that the scanner had been repossessed for nonpayment. 
Instead, he told them that referring physicians were not happy with the images the ADAC scanner
produced, and that he had arranged to acquire a better machine from General Electric. Several
witnesses, including Karl Hubner, confirmed that the GE machine was, in fact, superior to the
ADAC scanner.

In December 2001, appellant met with Robert Icenhauer-Ramirez, Chris Hubner's
former law partner and another of appellant's tax clients, to discuss an investment in P.E.T. 
Icenhauer-Ramirez testified that during this meeting, appellant told him that no one, including
appellant, was taking any money out of P.E.T. until it became profitable. Icenhauer-Ramirez agreed
to make an initial investment of $25,000. The following month, appellant told Icenhauer-Ramirez
that P.E.T. needed money to acquire the new scanner. Icenhauer-Ramirez agreed to wire $150,000
to GE for the initial payment. Of this amount, $50,000 was a thirty-day loan by Icenhauer-Ramirez
to P.E.T. and the remaining $100,000 constituted a further investment in P.E.T.: $25,000 by
Icenhauer-Ramirez and $75,000 by Chris and Karl Hubner, who reimbursed Icenhauer-Ramirez that
amount in exchange for additional units. 

The GE scanner arrived in early 2002, and the business reopened. When
Icenhauer-Ramirez later asked appellant to explain why his $50,000 loan had not been repaid,
appellant told him that business was slow. Appellant also reported that there was a cash-flow
problem due to delayed reimbursements from insurance companies. In March 2002, Chris and Karl
Hubner and Icenhauer-Ramirez agreed to co-sign a $50,000 bank loan to P.E.T. In April,
Chris Hubner was informed by the bank that P.E.T. was not making its loan payments. A GE
employee testified that P.E.T. defaulted on its scanner lease after making only one payment.

In June 2002, Icenhauer-Ramirez began asking to see P.E.T.'s books. Appellant
eventually gave him what was referred to as a ledger that purported to show all of the expenditures
appellant had made on P.E.T.'s behalf. In February 2003, Chris Hubner and Icenhauer-Ramirez
demanded to see the business checkbook. Appellant claimed that he did not have it, but he did turn
over copies of P.E.T. bank statements. These statements showed that substantial amounts of money
had been transferred from the P.E.T. account to an account appellant admitted was his. When asked
by Icenhauer-Ramirez to explain these transfers, appellant remained silent. Hubner testified that
during the February 2003 meeting, appellant denied taking any money out of P.E.T. for himself.

Icenhauer-Ramirez testified that appellant later delivered to him four boxes
containing what appellant said were P.E.T.'s business records. Icenhauer-Ramirez eventually gave
these records to the district attorney.

Belinda Murphy, a certified public accountant employed by the district attorney as
a forensic analyst, testified that she compared the ledger and bank statements appellant gave to
Hubner and Icenhauer-Ramirez to bank records subpoenaed by the State. (2) She said that the copies
of bank statements appellant gave to Hubner and Icenhauer-Ramirez were altered or incomplete, and
often omitted entries showing transfers from the business accounts to appellant's accounts. She also
testified that the ledger appellant gave to Icenhauer-Ramirez in June 2002 was inaccurate. The
subpoenaed bank records showed that payments entered in the ledger as business expenses had in
fact been made to appellant.

Murphy testified that the subpoenaed bank records reflected that appellant withdrew
$932,000 from the P.E.T. accounts by check, electronic transfer, and cash withdrawal. (3) Of this
amount, appellant took $207,000 in cash, $115,000 was deposited in appellant's brokerage account,
$367,000 was deposited in appellant's attorney-at-law account, $80,000 was deposited in appellant's
client trust account (IOLTA), and $143,000 was deposited in appellant's personal checking account. 
Murphy testified that she could not account for the remaining $20,000.

Marshall Vogt, a certified public accountant and the district attorney's senior forensic
analyst, testified that he also examined the subpoenaed bank records. According to Vogt's analysis,
appellant withdrew $129,000 from P.E.T. accounts during the last four months of 2000, $452,000
in 2001, $329,000 in 2002, and $18,000 during January and February 2003. The monthly
withdrawals ranged from a high of $73,500 in February 2001 to a low of $415 in February 2003. 
January 2002, when appellant withdrew $9900, was the only other month in which appellant
withdrew less than $10,000 from P.E.T. accounts.

Vogt testified that ninety-nine percent of the checks appellant wrote to himself on the
P.E.T. accounts had no memo notations indicating the purpose of the payment. Vogt also testified
that he was unable to find any documentation justifying the payments to appellant in the four boxes
of business records that appellant gave to Icenhauer-Ramirez in February 2002.

Appellant did not deny taking the $932,000. Instead, he testified that all of the
payments to himself were proper. Appellant said that he had paid himself director's fees of $45,000,
management fees of $48,000, legal and accounting fees of $45,000, and syndication fees of $50,000. 
Other payments were to reimburse him for expenses he had incurred on P.E.T.'s behalf, including
$12,000 for furniture and fixtures, $31,000 for a work station, and $99,000 for sales taxes. Appellant
pointed out that these payments were consistent with the proposed application of investment
proceeds contained in the private placement memorandum provided to the investors. Appellant
asserted that the remainder of the $932,000 constituted reimbursement either for business expenses
he had incurred or money he had advanced to the business. Appellant denied telling the other
investors that he would not take money out of the business until it was profitable.

Appellant also acknowledged diverting money from P.E.T. to a similar scanner
business he was attempting to start in Houston. He also confirmed Icenhauer-Ramirez's testimony
that appellant had discussed the possibility of starting a scanner operation in Houston, but that the
Austin investors had disapproved. Appellant admitted that he nevertheless spent $43,000 of P.E.T.
money to pay rent in Houston and an additional unspecified sum to pay consultants. Appellant also
conceded that although he was an owner of the Houston business, the other investors in P.E.T. did
not have an interest in that enterprise.


MOTION TO QUASH AND MOTION IN LIMINE


In two points of error, appellant contends that the trial court erred by overruling his
motion to quash the indictment and his motion in limine. First, appellant urges that the indictment
should have been quashed because it failed to give him adequate notice. Next, appellant contends
that by overruling the motion to quash and the motion in limine, the trial court "grant[ed] the State
a blanket exemption to the parol evidence rule."


Notice

Count one of the indictment alleged:


[B]eginning on or about the 1st day [of] August, 2000 and continuing through on or
about the 1st day of February, 2003, [appellant] did then and there unlawfully
appropriate, by acquiring and otherwise exercising control over property, to-wit:
United States currency from Dr. Mark Burr, Lisa Burr, Chris Hubner, Georjean
Hubner, Dr. Karl Hubner, Philipp Hubner, Sibyll Hubner, Robert Icenhauer-Ramirez,
Bill Scholl, Donnis Doyle, Mitchell Taylor, Shelley Taylor, Leona Jeffcoat and
P.E.T. Imaging, Ltd, the owners, without the effective consent of the owners, by
deception, and with intent to deprive the owners of the property, by creating and
confirming by words and conduct a false impression of fact, not believing it to be
true, that was likely to and did affect the judgment of another in the transaction, to
wit: [appellant] represented to the owners that the P.E.T. Imaging funds would be
expended on the business operation of P.E.T. Imaging, when in truth and in fact,
[appellant] expended the said P.E.T. Imaging funds in a manner inconsistent with the
business operation of P.E.T. Imaging.



See Tex. Penal Code Ann. § 31.03(a), (b)(1) (West Supp. 2010); see also id. § 31.01(1)(A), (3)(A). 
Count one further alleged that the stolen property had an aggregate value of $200,000. See id.
§ 31.09 (West 2003). It also alleged that appellant had been charged with the same offense in
two prior indictments, both of which were still pending. See Tex. Code Crim. Proc. Ann.
art. 12.05(b) (West 2005).

Count two of the indictment alleged:


[O]n or about the 1st day of August 2000 and continuing through on or about the 1st
day of February 2003, [appellant] intentionally, knowingly and recklessly
misappl[ied] property, to-wit: lawful United States currency, that [appellant] held as
a fiduciary, but not as a commercial bailee, in a manner that involved substantial risk
of loss of the property to Dr. Mark Burr, Lisa Burr, Chris Hubner, Georjean Hubner,
Dr. Karl Hubner, Philipp Hubner, Sibyll Hubner, Robert Icenhauer-Ramirez,
Bill Scholl, Donnis Doyle, Mitchell Taylor, Shelley Taylor, Leona Jeffcoat and
P.E.T. Imaging, Ltd, the owners of said property, by dealing with said property
contrary to an agreement under which [appellant] held the property: to wit:
[appellant] expended the PET Imaging funds in a manner inconsistent with the
business operation of PET Imaging, LTD.



See Tex. Penal Code Ann. § 32.45(a), (b) (West Supp. 2010). Count two further alleged that the
amounts misapplied had an aggregate value of $200,000. See id. § 32.03 (West 2003).

Appellant contends that the indictment was deficient because the two counts did not
specify the transactions by which the alleged unlawful appropriations and misapplications were
accomplished. In State v. Moff, a misapplication-of-fiduciary-property prosecution, the court
of criminal appeals held that the trial court did not err by granting the defendant's motion to quash
the indictment because it did not allege the specific transactions constituting the offense. 
154 S.W.3d 599, 603-04 (Tex. Crim. App. 2004). In Kellar v. State, an aggregated theft prosecution,
the court of criminal appeals stated that the defendant had a due process right to notice of the specific
instances of theft on which the State based its allegations. 108 S.W.3d 311, 313-14 (Tex. Crim.
App. 2003). In both opinions, however, the court wrote that the notice to which the defendant was
entitled did not necessarily have to be given in the indictment. See Kellar, 108 S.W.3d at 313
("[T]his due process requirement may be satisfied by means other than the language in the charging
instrument."); see also Moff, 154 S.W.3d at 603 (quoting Kellar). In Kellar, the court held that the
defendant's right to notice had been satisfied because, during a series of pretrial hearings, the
prosecutor gave defense counsel access to four binders documenting 149 transactions showing
instances of theft by the defendant, itemized lists of transactions on which the State intended to rely,
and bound copies of business records and affidavits to be introduced as evidence at trial. Kellar,
108 S.W.3d at 314.

The indictment in question was the third to be filed accusing appellant of these
offenses. In count one of the second indictment, cause number D-1-DC-05-900841, the State listed
the amounts appellant had unlawfully appropriated from each named complainant within a range (for
example, $20,000 or more but less than $100,000). In count two of the second indictment, the State
listed 403 individual transactions that allegedly constituted misapplications of fiduciary property,
giving the date and amount of each. In his memorandum in support of his motion to quash, appellant
stated that using the detailed allegations contained in the second indictment, he had conducted a
forensic audit of the business records in order to prepare his defense. Appellant complained that the
State had undercut his defense by omitting the detailed allegations in the third indictment, leaving
the defense in the dark as to the evidence on which the State would rely. At the hearing on the
motion to quash, defense counsel repeated this complaint, telling the court that "we had a forensic
audit done of the transactions identified by the State in the prior indictment as well as the investor
transactions, investor money transactions in the prior indictment." In response, the prosecutor told
the court that "the specific transactions set out in the second indictment are the bulk of the State's
case." She added that there were "a few more [transactions] than that, and we can give the Defense
discovery on that."

At trial, appellant expressed no surprise regarding the amounts said to have been
unlawfully appropriated from the investors. As for the alleged misapplications, a defense expert
testified that he had reviewed approximately 480 transactions identified by the State as being
unauthorized. During his own testimony, appellant introduced exhibits he had prepared to explain
how the allegedly unlawful transactions had a legitimate purpose.

Appellant asserts generally that he was entitled to greater notice, but he does
not explain how the alleged lack of notice impaired his defense. On this record, no constitutional
notice violation is shown with regard to the individual transactions constituting the alleged
misappropriations and misapplications.

Appellant contends that the theft count did not give him notice of the misstatements
by which he deceived the investors. In a theft prosecution, the State must, in response to a motion
to quash, allege the statutory manner by which the complainant's consent was rendered ineffective. 
Geter v. State, 779 S.W.2d 403, 407 (Tex. Crim. App. 1989). In this case, count one alleged that the
complainants' consent was induced by deception and, more specifically, by appellant's creating or
confirming by words and conduct a false impression of fact that was likely to and did affect the
complainants' judgment. See Tex. Penal Code Ann. § 31.01(1)(A), (3)(A). Further, the indictment
alleged that the deception consisted of "[appellant's] represent[ing] to the owners that the P.E.T.
Imaging funds would be expended on the business operation of P.E.T. Imaging, when in truth and
in fact, [appellant] expended the said P.E.T. Imaging funds in a manner inconsistent with
the business operation of P.E.T. Imaging." We conclude that these allegations gave appellant
adequate notice of the alleged misstatements by which he deceived the investors and rendered their
consent ineffective.

Appellant further complains that the allegation in both counts that he expended P.E.T.
funds "in a manner inconsistent with the business operations" of the enterprise was inadequate. He
urges that the indictment should have specifically alleged how each individual transaction was
inconsistent with P.E.T.'s business operations or exceeded the scope of appellant's authority to
manage the business. As noted above, however, appellant received a list of the transactions in
question, conducted a forensic audit of the transactions at issue, and offered evidence that each
transaction was a proper business expenditure. Once again, no violation of the constitutional right
to notice is shown.

Although this does not constitute a notice defect, appellant complains under this point
of error that it was improper to allege ownership in P.E.T. He contends that ownership should have
been alleged in some natural person acting for the partnership. The penal code provides that an
owner may be an individual, corporation, or association. Tex. Penal Code Ann. § 1.07(a)(35), (38)
(West Supp. 2010). When property is owned by an entity other than a natural person, ownership
may be alleged in either the entity or an individual acting as "special owner." Harrell v. State,
852 S.W.2d 521, 523 (Tex. Crim. App. 1993). No error is shown.

Finally, appellant complains of the absence of a tolling paragraph. There was
such a paragraph in count one, the theft count. None was required in count two, as the
third indictment was filed less than seven years after the alleged misapplications ended. See Tita
v. State, 267 S.W.3d 33, 35 n.1 (Tex. Crim. App. 2008); Tex. Code Crim. Proc. Ann. art.
12.01(3)(A) (West Supp. 2010).

Point of error one is overruled.


Parol evidence

In his second point, appellant urges that the indictment should have been quashed
because the allegation that he expended funds in a manner inconsistent with P.E.T.'s business
operations rested on parol evidence. Appellant argues at length that parol evidence was not
admissible to alter the terms of the written limited partnership agreement and the private placement
memorandum by which the units of P.E.T. were offered for sale to the investors.

We find no reference to parol evidence in appellant's motion to quash, although there
was some discussion of it in appellant's memorandum in support of the motion. Assuming that the
issue was raised in the motion to quash, no error is shown. The proper function of a motion to quash
is to test the facial validity of the indictment. State v. Rosenbaum, 910 S.W.2d 934, 947 (Tex. Crim.
App. 1994) (Clinton, J., dissenting) (op. adopted on reh'g). In a pretrial setting, there is no authority
for an accused to raise or for a trial court to determine the sufficiency of the evidence to support or
defeat an alleged element of the offense. Id. at 948.

Appellant also raised the parol evidence issue in his pretrial motion in limine. By this
motion, appellant asked the trial court to instruct the State's counsel to obtain a ruling outside the
jury's presence before mentioning or alluding to, among other things, "[a]ny and all evidence of any
alleged verbal agreements between any investor in Pet Imaging, Ltd. and [appellant] and/or alleged
verbal 'representations' made to any investor by [appellant]." This portion of the motion in limine
was denied.

The grant or denial of a pretrial motion in limine is a preliminary ruling only and
normally preserves nothing for appellate review. Geuder v. State, 115 S.W.3d 11, 14-15 (Tex. Crim.
App. 2003). This is because the court's ruling is subject to reconsideration throughout the course
of the trial. Norman v. State, 523 S.W.2d 669, 671 (Tex. Crim. App. 1975). The denial of
appellant's motion in limine did not, in itself, preserve appellant's contention that parol evidence was
improperly admitted. See Webb v. State, 760 S.W.2d 263, 275 (Tex. Crim. App. 1988).

The parol evidence rule is a substantive contract law principle by which evidence of
inconsistent prior or contemporaneous agreements may not be used to vary or contradict the
unambiguous language in the parties' written contract. National Fire Ins. Co. v. CBI Indus.,
907 S.W.2d 517, 520 (Tex. 1995). Appellant cites code of criminal procedure article 1.27 to support
his claim that the parol evidence rule applies in criminal prosecutions. Tex. Code Crim. Proc. Ann.
art. 1.27 (West 2005). But that statute merely provides that common law rules of procedure apply
in the absence of a statutory rule. The parol evidence rule is not a procedural rule.

Under count one, appellant was accused of unlawfully appropriating the
complainant's money by deception. "Deception" means creating or confirming by words or conduct
a false impression of law or fact that is likely to affect the judgment of another in the transaction, and
that the actor does not believe to be true. Tex. Penal Code Ann. § 31.01(1)(A) (West Supp. 2010). 
Under count two, appellant was accused of misapplying property he held as a fiduciary. "Misapply"
means dealing with property contrary to an agreement under which the fiduciary holds the property. 
Id. § 32.45(a)(2)(A). Appellant cites no pertinent authority to support his contention that the State
could offer no evidence of appellant's deceptive conduct and misapplication of property other than
that reflected in the written documents provided to the complainants at the time they invested.

Point of error two is overruled.


SUFFICIENCY OF EVIDENCE


In points of error three and four, appellant contends that the evidence is legally
and factually insufficient to sustain the findings of guilt. We no longer employ distinct legal
and factual sufficiency standards when reviewing the sufficiency of the evidence to sustain
a criminal conviction. Instead, the only standard for determining whether the evidence proves a
defendant's guilt beyond a reasonable doubt is the Jackson due process standard. Brooks v. State,
323 S.W.3d 893, 912 (Tex. Crim. App. 2010); see Jackson v. Virginia, 443 U.S. 307, 319 (1979). 
Under Jackson, the question presented is whether, after viewing all the evidence in the light most
favorable to the verdict, a rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt. 443 U.S. at 319. The reviewing court may impinge on the trier of
fact's discretion only to the extent necessary to guarantee the fundamental protection of due process
of law.  Id.


Theft

Under count one, it was the State's burden to prove that appellant, pursuant to one
scheme or continuing course of conduct, unlawfully appropriated $200,000 or more from the
complainants by creating or confirming by words or conduct a false impression of fact that was likely
to affect the complainants' judgment in the transaction and that appellant did not believe to be true: 
"that P.E.T. Imaging funds would be expended on the business operation of P.E.T. Imaging, when
in truth and in fact, [appellant] expended the said P.E.T. Imaging funds in a manner inconsistent with
the business operation of P.E.T. Imaging." It was not necessary for the State to prove an unlawful
appropriation from each named complainant; the evidence is sufficient if the State proved that
appellant unlawfully appropriated a total of at least $200,000 from one or more of the named
complainants. See Lehman v. State, 792 S.W.2d 82, 84 (Tex. Crim. App. 1990); De La Fuente
v. State, 264 S.W.3d 302, 318-19 (Tex. App.--San Antonio 2008, pet. ref'd).

Aggregation. It was undisputed that during the time period alleged in the indictment,
the Hubners, Mark and Lisa Burr, Mitchell and Shelly Taylor, Bill Scholl and Donnis Doyle, and
Robert Icenhauer-Ramirez invested a total of $545,000 in either P.E.T. or MSO. (4) There was also
no dispute that these investments were made pursuant to a single scheme or course of conduct by
which appellant solicited investments in P.E.T. and MSO.

Ownership. Appellant contends that the complainants, as limited partners, did not
own the partnership assets. This contention is irrelevant to the theft count. Appellant was not
accused of stealing partnership assets from the complainants. Rather, appellant was accused of
unlawfully appropriating the money invested by the complainants in the partnerships.

Appropriation and intent to deprive. Most property transactions involve the
acquisition of another's property with the intent to deprive him or her of it. See McClain v. State,
687 S.W.2d 350, 354 (Tex. Crim. App. 1985). That is plainly true of appellant's acquisition of the
money the complainants invested in P.E.T. and MSO. What makes an appropriation unlawful is the
lack of effective consent by the owner.

Effective consent. The State alleged that the complainants' consent to appellant's
appropriation of the money they invested in P.E.T. and MSO was not effective because they were
induced to invest by appellant's deceptive words and conduct. The deception alleged in the
indictment was that, contrary to the representations he made to the complainants, appellant expended
P.E.T. funds in a manner inconsistent with the proper operation of the business.

Icenhauer-Ramirez testified that before he invested in P.E.T., appellant told him that
he, appellant, would receive no salary or fees from P.E.T. until the business was profitable. Other
investors testified that appellant did not tell them that he was taking money from the business, and
that they would not have invested if they had known that he was doing so. Appellant contends that
this testimony should be given no weight because it is parol. We have already explained why
appellant's reliance on the parol evidence rule is mistaken. Further, we consider all the evidence
before the jury in determining the sufficiency of the evidence. Garcia v. State, 919 S.W.2d 370, 378
(Tex. Crim. App. 1994). Finally, even if we were to disregard appellant's oral statements to the
investors, the written partnership agreement obliged appellant, as manager of the general partner, to
expend P.E.T. funds only for the benefit of the partnership. Appellant does not refer us to any
provision in the written agreement that permitted him to expend P.E.T. funds for other than
legitimate business purposes.

Appellant contends that the complainants were not deceived because the private
placement memorandum disclosed that proceeds from the offering would be used to pay offering
expenses, startup costs, and operating expenses. This argument assumes that the $932,000 that
appellant admittedly paid to himself from the P.E.T. accounts was, as he testified, payment for
services rendered to the partnership or reimbursement for legitimate business expenses. The jury
was not required to believe appellant's testimony, however. In light of the evidence that appellant
hid the payments to himself and gave Hubner and Icenhauer-Ramirez false documents when they
demanded an accounting, the jury could reasonably infer that there was no legitimate business
purpose for these payments. Moreover, appellant conceded that he withdrew hundreds of thousands
of dollars from the partnership at a time when he was not making the lease payments on the scanners. 
The jury could reasonably conclude that by paying himself while allowing the ADAC scanner that
was crucial to the business to be repossessed, appellant expended P.E.T. funds in a manner that was
not consistent with P.E.T.'s business operations. Appellant's argument also fails to take into account
his admission that he used more than $43,000 of P.E.T. funds to start an unrelated scanning business
in Houston, a use of partnership funds that was neither disclosed to the investors nor consistent with
P.E.T.'s business operations.

Viewing all the evidence in the light most favorable to the guilty verdict, the jury
could rationally have found beyond a reasonable doubt that appellant, by his words and conduct,
gave the complainants the false impression that P.E.T. funds would be expended in a manner
consistent with P.E.T.'s business operation, not believing it to be true. The jury could also rationally
have found that this false impression was likely to and did affect the judgment of one or more of the
complainants so as to render ineffective their consent to appellant's appropriation of more than
$200,000 they invested in P.E.T. and MSO. The evidence is legally sufficient to sustain the jury's
verdict convicting appellant of theft.


Misapplication of fiduciary property

Under count two, it was the State's burden to prove that appellant, pursuant to
one scheme or continuing course of conduct, intentionally, knowingly, or recklessly misapplied
$200,000 or more that he held as a fiduciary for the benefit of the complainants by expending P.E.T.
funds in a manner inconsistent with P.E.T.'s business operations and that involved a substantial risk
of loss. Once again, the evidence is sufficient if the State proved that appellant misapplied a total
of at least $200,000 from one or more of the named complainants. See Lehman, 792 S.W.2d at 84;
De La Fuente, 264 S.W.3d at 318-19.

Fiduciary. A "fiduciary" includes an officer or manager carrying on fiduciary
functions on behalf of a fiduciary. Tex. Penal Code Ann. § 32.45(a)(1)(D) (West Supp. 2010). 
Under the terms of the partnership agreement, appellant, as manager and general partner of
P.E.T., was accountable to the limited partners as a fiduciary. We do not understand appellant to
argue otherwise.

Ownership. Appellant urges that the complainants were not shown to be the owners
of the partnership assets as alleged in count two. However, the complainants, as limited partners in
P.E.T., had a beneficial interest in the partnership assets, and appellant held the partnership assets
for the benefit of the complainants. Although it might have been more accurate for the indictment
to describe the complainants as "persons for whose benefit the property was held," referring to them
as "owners" did not, under the circumstances of this case, give rise to a material variance. See
Gollihar v. State, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001). An immaterial variance may be
disregarded in reviewing the sufficiency of the evidence. Fuller v. State, 73 S.W.3d 250, 254 (Tex.
Crim. App. 2002).

Misapplication. Appellant insists that his withdrawals from the P.E.T. accounts did
not violate the agreement under which he held the property because, as manager and general partner,
he had "absolute authority" to manage the partnership assets. But under the partnership agreement,
appellant had a fiduciary responsibility to exercise his management authority solely for the benefit
of the partnership. Contrary to appellant's assertion, his managerial authority did not permit him to
expend P.E.T.'s assets in any manner he saw fit.

As we have already discussed, appellant admitted diverting more than $43,000 of
P.E.T. funds to the scanner business in Houston in which P.E.T. had no interest. The evidence
shows that appellant withdrew $452,000 from P.E.T. in 2001, the year in which appellant, as
manager of P.E.T., made no lease payments on the ADAC scanner, resulting in its repossession. 
Appellant withdrew another $329,000 in 2002, a year in which appellant made only one lease
payment on the GE scanner. Appellant testified that he was entitled to this money, and to the
remainder of $932,000 that he admittedly withdrew from P.E.T. accounts, as compensation for
services he provided to the partnership or reimbursement for business expenses he personally bore. 
This claim was contrary to appellant's statement to Icenhauer-Ramirez that he would take no salary
or fees from P.E.T. until the business was profitable. The claim was also belied by the evidence that
appellant hid the payments to himself, going so far as to give Hubner and Icenhauer-Ramirez altered
bank statements and a ledger in which payments to appellant were disguised. The evidence also
shows that the boxes of business records appellant later produced contained no receipts or other
documents justifying the payments to appellant. Once again, the jury was not obliged to credit
appellant's exculpatory testimony. The jury could rationally infer that there was no legitimate
business purpose for the withdrawals appellant made from the P.E.T. accounts and that these
withdrawals constituted a misapplication of P.E.T. assets.

Viewing all the evidence in the light most favorable to the guilty verdict, the jury
could rationally have found beyond a reasonable doubt that appellant, pursuant to one scheme or
continuing course of conduct, intentionally misapplied more than $200,000 that he held as a
fiduciary for the benefit of the complainants by expending P.E.T. funds in a manner that was
contrary to the agreement under which he held the funds, was inconsistent with P.E.T.'s business
operations, and involved a substantial risk of loss. The evidence is legally sufficient to sustain the
jury's verdict convicting appellant of misapplying fiduciary property.

Points of error three and four are overruled.


PROSECUTION FOR DEBT


Appellant's last point of error concerns the evidence of the $50,000 loan
Leona Jeffcoat made to appellant in July 2001 and the $50,000 loan Icenhauer-Ramirez made to
P.E.T. in January 2002. Appellant argues that the admission of this evidence and the consideration
of these loans by the trial court in assessing punishment violated the constitutional prohibition on
imprisonment for debt. See Tex. Const. art. I, § 18.

Under the constitution, a prosecution for theft will not lie merely for the nonpayment
of a debt. Howell v. State, 478 S.W.2d 468, 469 (Tex. Crim. App. 1972). Article I, section 18 does
not apply, however, if the loan was procured by false pretext. Id. It was the State's contention that
Jeffcoat and Icenhauer-Ramirez made the loans based on appellant's false representations regarding
his management of P.E.T. and the financial status of the business. It was not appellant's failure to
repay the loans that constituted the alleged unlawful appropriation, but the manner in which
appellant procured the loans in the first place.

There was ample evidence to support appellant's conviction for theft without regard
to the two loans. (5) If the trial court considered appellant's fraudulent procurement of the loans in
assessing punishment, it had the discretion to do so. See Tex. Code Crim. Proc. Ann. art. 37.07,
§ 3(a)(1) (West Supp. 2010) (in assessing punishment, consideration may be given to any matter
court deems relevant to sentence, including extraneous bad acts shown to have been committed by
defendant). The court did not order payment of restitution in any amount.

Appellant's contention that he has been prosecuted and imprisoned for debt is without
merit. Point of error five is overruled.

The judgments of conviction are affirmed.



 __________________________________________

 J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed: April 19, 2011

Do Not Publish
1. Appellant insisted at trial that the arrangement with ADAC was not a lease, but a purchase
order. The distinction is irrelevant to our decision and this opinion.
2. Murphy examined statements for six accounts belonging to P.E.T, GP, and MSO, and five
accounts belonging to appellant.
3. We have rounded the amounts to the nearest thousand.
4. In addition, Icenhauer-Ramirez loaned $50,000 to P.E.T. and Leona Jeffcoat loaned $50,000 to
appellant "for the business." We have not taken these loans into account in determining the
sufficiency of the evidence. In our discussion of points of error three and four, any reference to "the
complainants" means the named investors in the limited partnerships and does not include either
Jeffcoat or P.E.T. Imaging.
5. See fn. 4, supra.